JUDGE OETKEN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

LISA GUTTILLA,

                 Plaintiff

14 CV 0156

DOCKET NO.

      -against-

**COMPLAINT**
*JURY TRIAL DEMANDED*

CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF EDUCATION DENNIS
WALCOTT, CHANCELLOR AND THERESA EUROPE,
OFFICE OF LEGAL SERVICES; UNITED
FEDERATION OF TEACHERS PRESIDENT
MICHAEL MULGREW; NEW YORK STATE UNITED
TEACHERS' ASSISTANT GENERAL COUNSEL
CLAUDE HERSH AND ATTORNEY STEVEN
FRIEDMAN; JOSEPH GOGLIORMELLA, PRINCIPAL
OF JAMES MADISON HIGH SCHOOL;   DAVID B.
HARMAN Head Master of Poly Prep Country Day School; JODI COHEN Assistant
Principal of James Madison High School, ALL SUED
IN THEIR OFFICIAL AND INDIVIDUAL CAPACITY,

U.S. DISTRICT COURT
FILED
JAN 10 2014
S.D. OF N.Y.

                 Defendants

_____x

PLAINTIFF LISA GUTTILLA, proceeding Pro Se, as and for her Summons and
Complaint filed to protect her Constitutional rights against the above-captioned
defendants, alleges upon knowledge as to her own facts and upon information and belief
as to all other matters:

### PRELIMINARY STATEMENT

1.This is a civil action seeking injunctive relief, monetary relief,  including past and on-
going economic loss, compensatory and punitive damages, costs and fees for violations
of Constitutionally protected rights brought pursuant to:  the First, Fifth, Seventh, and
Fourteenth Amendments to the United States Constitution; 42 U.S.C §1983, § 1985(2),
(3);  §1986; 28 U.S.C. § 1331, §1343, §1367, §1443; 18 U.S.C. §241, §242, §641;  18
U.S.C. §1341, §1343; 18 U.S.C. §1505, §1512,  §1513, and §1515;  Civil Rights Law
§§70, 76-a, Article I, § 8, §11 of the New York State Constitution; and other State law
claims codified in the New York State Constitution as well as in the New York Civil
Practice Law and Rules ("CPLR") as they relate to:  prohibition of obstruction of justice,
tampering with witnesses and contracts, conversion of property and fraud; support for

1

freedom of speech and assembly; freedom from malice in law, from abuse of process and malicious prosecution, stigma plus character defamation; and from the intentional infliction of emotional harm.

2. Specifically, Plaintiff alleges that Defendants, with flagrant disregard for Plaintiff's Constitutionally protected rights, wantonly, recklessly, maliciously, knowingly and purposefully, acting *ultra vires* individually under a ministerial cloak and in conspiracy with each other under color of state law, have deprived Plaintiff of her protected rights of freedom of speech, assembly, and enjoyment of liberty and property in order to harass, intimidate, defame, and deprive her of her lawful rights.

3. None of Plaintiff's causes of action are frivolous, and all are brought to this for the violation of numerous Constitutional rights by Defendants, many of whom are under oath to the State of New York to be impartial and honor the rules, and Statutes of the State of New York, yet deliberately chose not to.

4.. Plaintiff's invocation of the equitable powers of this Court is just and proper based upon a pattern, practice, custom and policy of bad faith, harassment, defamation and intentional infliction of emotion distress to further a corrupt scheme against Plaintiff's person and property by defaming her good name in such a manner as to cause her harm for no valid reason other than retaliation, and bad faith. Plaintiff seeks economic and compensatory damages and punitive damages to the extent allowable by law, and other appropriate legal and equitable relief pursuant to federal, state and city law.

## JURISDICTION AND VENUE

5. Jurisdiction of this Court is invoked under:  the First, Fifth, Seventh, and Fourteenth Amendment to the United States Constitution; 42 U.S.C §1983, § 1985(2), (3); 18 U.S.C. §1505, §1512, §1513, and §1515;

6. Formerly known as ancillary and pendant jurisdiction, supplemental jurisdiction under 28 U.S.C. §1367 permits both pendent claim and pendent party jurisdiction. 28 U.S.C. §1367 changed "the pre-existing law in that it makes supplemental jurisdiction mandatory, not discretionary". This court has the power to issue declaratory relief pursuant to 28 USC §§2201 and 2202; this Court has supplemental jurisdiction over Plaintiff's state and city law claims under 28 USC §1367(a).

7. 28 U.S.C. 1343(3) provides for original jurisdiction of the district court:
To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

8. 28 U.S.C. 1331(a) provides:

The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.

9. 42 U.S.C. 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States

or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

10. Plaintiff alleges that she has a prima facie case under 42 U.S.C. §1983 as the actions cited herein [a] occurred "under color of law" and [b] are derivations of Constitutional rights as well as federal and state statutory rights.

11. Instead, Plaintiff was harassed into resigning her position leaving her permanently scarred and her name defamed. Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to influence, delay, or prevent the testimony of any person in an official proceeding, or cause or induce any person to withhold testimony, or withhold a record, document, or other object, from an official proceeding, as Defendants have attempted to do by threatening is acting unlawfully and is tampering with an informant. This Court has jurisdiction over 18 U.S.C. §1512.

12. Venue herein is proper under 28 U.S.C. §1391(b) because the causes of action arose in the Southern District of New York, and the events or omissions giving rise to Plaintiff's claims occurred in this District.

13. Defendants have waived any protection or immunity they may have enjoyed under the Eleventh Amendment to the Constitution of the United States of America because they knowingly, maliciously and intentionally inflicted the most emotional, physical, and financial harm possible on Plaintiff without any right to do so. Defendants also do not have protected status giving them absolute or quasi-judicial immunity as a result of their deliberate actions.

14. The presence of malice and the intention to deprive a person of his/her civil rights is wholly incompatible with the Defendants' policy, use and premise of public service.

15. When the municipal department and/or State is one of the perpetrators and violators as in the instant case, there can be no expectation of just, if any, relief from it. Neither can cause a federal violation, and then try to prohibit litigants from seeking redress in the federal courts for those same violations.

16. There is no court other than this one that can hear the claims asserted by Plaintiff in the instant complaint.

17. The headquarters of the New York City Department of Education is located at 52 Chambers Street, New York City, and they all routinely conduct business within the Southern District of New York.

THE PARTIES

18. Plaintiff was a tenured Health and Physical Education teacher in the NYC school system for 17 years. Other teaching positions include: Brook Wood Sleep Away Camp,

3

Port Jervis New York, where she was a Camp counselor for 5-7 year old girls during the summer; Staten Island academy, Staten Island; June 1991- August 1998 she was Head counselor & assistant director of basketball camp. Plaintiff coached boys' varsity volleyball at Staten Island academy; coached and started the girls varsity volleyball team, St. John's villa; Fort Hamilton HS, Brooklyn coached Junior Varsity girls' basketball, JV girls softball, varsity girls volleyball; Poly prep country day school, Junior Varsity softball, girls Varsity volleyball.

Plaintiff received a B.A. from St. Francis College, a Masters Degree from Brooklyn College, and completed her M.S. plus 30 credits above, in fine art at Kingsboro Community College.

Personal achievements include Scholarship athlete for softball and volleyball to St Francis college; Captain of the softball team; Captain of the volleyball team; Northeast conference all-star third baseman.

20. At all times relevant in this Complaint, Defendant New York City Department of Education, is a "public employer" within the meaning of New York State Civil Service Law §75-b(i)(a) and therefore empowered to be the governing body of the District and existing under the laws of the State of New York, and is subject to the provisions of New York State Law, the New York State Constitution and the United States Constitution. At all times relevant to this action, Defendant has been the employer within the meaning of employment and contract law.

21. At all times relevant to this Complaint, Defendant Dennis Walcott is the person appointed as "Chancellor" of the New York City Department of Education. He was and is a co-worker of the individuals named in the matter cited herein and as such assisted in the misconduct and false claims made against Plaintiff. Walcott is responsible for creating and implementing policies carried out in accordance with the U.S. Constitution and all federal, state,  and city laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York.

22. . At all times relevant to this Complaint, Defendant Theresa Europe was the Deputy Counsel to the Chancellor inside the New York City Department of Education's Office of Legal Services and was responsible for creating and implementing policies carried out in accordance with the U.S. Constitution and all federal, state,  and city laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York.

23. At all times relevant to this Complaint, Defendant Claude Hersh was the Assistant General Counsel to the New York State United Teachers, or NYSUT, the legal arm of the United Federation of Teachers (UFT) and was responsible for creating and implementing policies carried out in accordance with the U.S. Constitution and all federal, state,  and city laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York and the rules, regulations and contractual agreements created under the UFT to protect and preserve the lawful rights of members such as Plaintiff.

24. At all times relevant to this Complaint, Defendant Steven Friedman was the NYSUT Attorney who was responsible for creating and implementing policies carried out in accordance with the U.S. Constitution and all federal, state, and city laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York and the rules, regulations and contractual agreements created under the UFT to protect and preserve the lawful rights of members such as Plaintiff.

25. At all times relevant to this Complaint, Defendant Joseph Gogliormella was the Principal of James Madison High School, and as such was responsible for creating and implementing policies carried out in accordance with the U.S. Constitution and all federal, state, and city laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York as well as the rules, regulations and contractual agreements created under the UFT to protect and preserve the lawful rights of members such as Plaintiff.

26. At all times relevant to this Complaint, Defendant Michael Mulgrew was and is the President of the UFT and the person who was responsible for creating and implementing policies carried out in accordance with the U.S. Constitution and all federal, state, and city laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York and the rules, regulations and contractual agreements created under the UFT to protect and preserve the lawful rights of members such as Plaintiff.

27. At all times relevant to this Complaint, Defendant Jodi Cohen was the Assisant Principal at James Madison High School and she claimed that Plaintiff did not notify the Defendants about her arrest "immediately" which she knew was false, and which caused Plaintiff to lose her grievance on this issue. Defendant Cohen was an employee of the Department of Education at all times relevant to this Complaint and as such was responsible for creating and implementing policies carried out in accordance with the U.S. Constitution and all federal, state, and city laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York as well as the rules, regulations and contractual agreements created under the UFT to protect and preserve the lawful rights of members such as Plaintiff.

28. At all times relevant to this complaint, Defendant David B. Harmon Head Master of Poly Prep Country Day School but never heard Plaintiff's defense in the matter complained about herein. Instead, he told colleagues of Plaintiff to have no contact with her or they would lose their jobs, and the members of the adult vollyball league in which Plaintiff was a member asked that she, Plaintiff, stop playing, and then gave her the money back she paid for membership. Defendant Harmon would not talk with Plaintiff or the private investigator hired to look into the allegations in the matter reviewed here. Defendant Harmon was an employer was responsible for creating and implementing policies carried out in accordance with the U.S. Constitution and all federal, state, and city laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York and preserve the lawful rights of members such as Plaintiff.

FACTUAL BACKGROUND

29. Plaintiff alleges that the Defendants intentionally made misrepresentations that led Plaintiff to believe that the Defendants would not impede her from future job opportunities, which induced her to sign a resignation letter, when in fact they did impede her from employment and in so doing, harmed her pecuniarily.

30. The point is that when important issues for a tenured teacher are at stake, the Report of the Special Commissioner of Investigation is more of an indictment and there should be a right to confront adverse witnesses. No such right of confrontation was afforded Plaintiff.

31. On January 21, 2009, Plaintiff was accused of sexual misconduct with a team manager on the Varsity Volleyball Team at Poly Prep, a private school. (The season started the end of August to mid November). Plaintiff was not coaching at Poly Prep at

that time. Plaintiff hired a private attorney Barry Gene Rhodes who represented her in court. At the request of her attorney she willingly took a polygraph test on February 23, 2010, which she passed. Defendants refused to discuss the allegations with anyone, and continued to state that the allegations were "true" without any supporting information for the false claims made by the mother. None of the Defendants would speak with Plaintiff to hear her side of the story, but made her guilty without any due process.

32. Plaintiff and her attorney attended court seventeen (17) times in the course of 1½ years and no family member of the so-called "victim" ever showed up. Plaintiff and Rhodes were hoping that this case would go to trial, so that the truth would come out and she could continue her life as a dedicated teacher. When the District Attorney spoke to the judge, she said the parents were divorced and this was a dysfunctional family and they could not move forward with this case. The Department of Education Attorney Theresa Europe ("Europe") and her crew, the DOE Administrative Trials Unit, moved forward with 3020 charges.

33. The mother of the alleged "victim" tried to extort $5,000.00 from Plaintiff on a text message, accusing her of giving her daughter a hickey, which was absurd. She said if Plaintiff gave her the money she would make all this go away. Plaintiff adamantly refused and then she went to the police. The charges were dropped when the Complainant refused to pursue any prosecution, and the case was sealed July 28, 2011.

34. Throughout her teaching and coaching career Plaintiff has never engaged in sexual misconduct or inappropriate behavior with anyone in any way. Plaintiff argued at all times that the allegations were completely false, however her NYSUT Attorney Steve Friedman forbade her from speaking when they began their second prosecution, her 3020-a hearing. He also forbade her from speaking at her Probable Cause hearing, thus convincing both Arbitrators, Martin Scheinman and Eleanor Glanstein, that Plaintiff was, indeed, guilty as charged.

35. Despite the closing of this matter in July by the District Attorney, on September 7, 2011 the Defendant's Counselor to the Chancellor, Theresa Europe, sent an email communication to Deputy Commissioner Regina Loughran requesting an investigation into Plaintiff's alleged "inappropriate sexual conduct" with a private school student. As the student would not press charges nor step forward, Theresa Europe became the "Complainant" on SCI's case form dated 9/14/2011. SCI and Theresa Europe released the allegations to the newspapers that Plaintiff was charged with sexual misconduct, then charged Plaintiff with the allegations, made much worse by quadruple hearsay added by Europe and Defendant's prosecuting Attorney Jordana Shenkman. (EXHIBIT 1). 34. Specification 6 (A)-(D) charged Plaintiff with causing "widespread negative publicity, ridicule and notoriety to the NYC Department of Education as said misconduct was reported in the New York area news reports, papers and online including...." and listed the articles that were written about the allegations. This tactic allows the Defendant to claim that the allegations are true, despite the fact that no reporter and no DOE investigator has any proof whatsoever. No one spoke with Plaintiff.

36. The unconscionable and knowingly reckless, arbitrary and capricious process which produced this result was initiated under color of law upon quadruple hearsay and in pursuit of removing Plaintiff, a lesbian woman, from the Department because she was a lesbian and without proper due process guaranteed by law. The false accusations which lead to her resignation ruined Plaintiff's life and reputation.

37. On May 28, 2010, Arbitrator Martin Scheinman found that there was probable cause to remove Plaintiff from payroll for sexual abuse of a minor who was not a student. His decision reeks of bias and fraud, as he made the decision to remove her from payroll under color of law and without subject matter jurisdiction. The NYC Department of Education claimed that it established probable cause to "believe" Plaintiff committed serious misconduct because Plaintiff had been accused of this, and the newspapers "substantiated" this "fact".

38. Defendants asserted to Scheinman that the finding of probable cause and removal from salary did not require witnesses to be produced or an investigation or substantiation by the Special Commissioner of Investigation ("SCI") be shown, denying Plaintiff her procedural due process rights pursuant to Law and Article 21(G), to have evidence proving misconduct presented before her salary was taken away. The Department never submitted a scintilla of proof of their claims against Plaintiff.

39. Scheinman agreed with this nonsense. He wrote in his decision, "In its view, once the requisite criminal charges are shown to be pending against an educator, probable cause is established..." (decision, EXHIBIT 2, pp. 8-9). He continued on p. 11 as follows:
"Since [Respondent] is charged with criminal conduct based upon acts of sexual misconduct within the meaning of the Agreement, the rebuttable presumption of probable cause is established. The presumption was not rebutted during the hearing on March 18, 2010. Therefore I conclude probable cause exists to remove [Respondent] from payroll under the terms of the Agreement.
I reject [Respondent's contention substantiation by SCI was required in this case in order to establish probable cause." (EX. 2, p. 11) He then goes on to the Agreement itself, and quotes:
"Article 21(G)(6) of the Agreement (here, Exhibit 3), states in pertinent part:
A rebuttable presumption of probable cause shall exist where the Special Commissioner of Investigations ("SCI") substantiates allegations of sexual misconduct **or** a tenured pedagogue has been charged with criminal misconduct based on act(s) of sexual misconduct (Emphasis supplied)." (EX. 2, pp. 11-12)
Scheinman then wrote, "...the parties intended the presumption [to] exist when either event is demonstrated. Therefore, since the Department has shown [Respondent] is charged with criminal conduct based upon act(s) of sexual misconduct, the rebuttable presumption exists, without any need for substantiation of the alleged acts by SCI." (decision, p. 12) . He then rejected Plaintiff's argument that evidence of investigation has to be presented in order to find probable cause:
"After all, the whole purpose of a presumption is to establish a fact or condition without the need for proof....Once a presumption is established, the presumed fact or condition exists." (Ex. 2, p. 13)

40. However, the record of the March 18, 2010 probable cause hearing shows that Plaintiff, through her Attorney, Steven Friedman, of Counsel, New York State United Teachers ("NYSUT") argued against the determination of probable cause:
""...to establish probable cause, the investigator assigned to the matter must be present and testify under oath before the arbitrator. The Board may also be required to produce signed statements from the victim or witnesses...We have nothing here....We do not have the victim...We have nothing..." (Exhibit 3, transcript, p. 8).

7

The Department argued, "...the Department is not required to have any witnesses for a finding of probable cause. All we must show simply is that the [Respondent] has been charged with criminal conduct based on sexual misconduct. And that's what we've done here by submitting the criminal complaint." (pp. 9-10)

Finally, Scheinman concluded, "In this case, the presumption of probable cause was established by the Department's showing [Respondent] is charged with criminal offenses based upon acts of sexual misconduct against a minor. Since the presumption was not rebutted, probable cause is deemed to exist, without need of further evidence.

Thus, for all the foregoing, I find probable cause exists to remove [Respondent] from payroll under the terms of the parties' Agreement. (Ex. 2, p. 13)

Scheinman's Award (Ex. 2, p. 14) was to remove Plaintiff from payroll "in accordance with the Serious Misconduct language" set forth in the UFT-DOE contract dated October 3, 2005. He did not follow the letter of the Law nor the Agreement in finding probable cause to be removed from salary without the investigator, the victim, or any testimony or proof of the charges. Plaintiff was removed from payroll without any Just or probable cause for one and a half years.

41. On June 18, 2012 Plaintiff again was brought to a Probable Cause Hearing in front of Arbitrator Martin Scheinman, Esq. , clearly showing a violation of Plaintiff's rights to due process. The SCI investigator, Mr. Jeffrey Anderson, testified that he never interviewed the so-called "victim" (EXHIBIT 4, p. 16, lines 10-12) nor Plaintiff, but found Plaintiff guilty as charged. Attorney Shenkman argued "...there is plenty of evidence here sufficient for probable cause. There's a rebuttable presumption on the Article 21-G that says as long as SCI substantiates sexual misconduct, then there is a presumption of probable cause."

42. Plaintiff was brought to 3020-a without a proper determination of probable cause. Defendant Europe, as the "Complainant" sent charging form letters to Plaintiff's Principal, Joseph Gogliormella, and advised him to sign his name and put the name of the school at the top. He did this, and thus started the 3020-a proceedings based upon the improper determination of probable cause by him. He has no authority under 3020-a Law to find probable cause. Despite this violation of 3020-a Law, with the effect of denying Plaintiff her due process rights guaranteed to her as a tenured teacher, Arbitrator Eleanor Glanstein went forward with a hearing. Glanstein had no subject matter jurisdiction to proceed. Plaintiff's NYSUT Attorney Steve Friedman forbade her from speaking and did not allow Plaintiff to call any witnesses who could testify on her behalf. He then convinced her to resign, even though he knew that Plaintiff would not have a problem winning her 3020-a hearing, because her accuser, the private school student, would not testify.

43. On June 29, 2012, despite there being no proof whatsoever of the allegations, and after malicious prosecution by the Office of Legal Services at the Department of Education, Plaintiff was forced to sign an irrevocable resignation separating her from her employment, and she was harassed into agreeing to "waive [her] right to make any legal or equitable claims or to initiate legal or administrative proceedings of any kind" in the Post-Charge Stipulation of Settlement (EXHIBIT 5, attached).

44. Upon information and belief the Post-Charge Stipulation of Settlement is not valid for the following reasons:

(i) Arbitrator Glanstein, appointed pursuant to Education Law 3020-a, did not have subject matter jurisdiction to proceed with this matter due to the denial of due process guaranteed to Plaintiff pursuant to the Constitution, UFT contract, and Education Law 3020-a yet went forward anyway and permitted Plaintiff to resign without the presentation of any facts of Plaintiff's misconduct alleged by Defendants;

(ii) Defendant Theresa Europe did not have standing to be the "Complainant";

(iii) Principal Joseph Gogliormella of James Madison High School did not have any authority to find probable cause in this matter, yet he signed the charging papers anyway;

(iv) The Post-Charge Stipulation of Settlement was not signed by Joseph Gogliormella.

## ARGUMENT

45. Defendants' purpose was to crush Plaintiff, defame her, and deny Plaintiff her lawful and protected rights to freedom of speech, and other civil rights and due process protections pursuant to both State and Federal statutes. Defendants have shown frivolous conduct and flagrant disregard, actionable negligence, fraud and bad faith in public policy. It is true that the state courts are wholly without power in any way to control the operations of the federal courts, but the reverse is not true. Furthermore the federal courts possess the right to protect their own jurisdictional rights or the rights of parties to suits before them by restraining orders forbidding proceedings in the state courts.

46. Plaintiff Pro Se requests this Court's notice of the following: that Plaintiff has tried her best to file a pleading that is in accordance with Rule 8(a)(2), and asks that this court review the complaint in light of this as a best effort made in good faith; and that any consideration of a Rule 12(b)(6) dismissal for failure to state a claim upon which relief can be granted requires that a Court accept as true all well-pled factual allegations within and outside the pleadings, since a motion to dismiss for failure to state a claim tests only the legal sufficiency of a complaint, and a plaintiff is thus required to allege only enough facts to state a claim to relief that is plausible on its face. Plaintiff has, she alleges, met this standard to the best of her ability and the instant complaint is not frivolous and states a cause of action that is valid under the laws of this Court to pursue.

47. Defendants have shown a conscious disregard for the rights and reputation of Plaintiff and acted so recklessly as to amount to such disregard. New York State public policy prohibits insurance indemnification for punitive damage awards and prohibits insurance coverage for punitive damages assessed against New York insureds. Plaintiff was and continues to be subjected to the intentional infliction of emotional harm, verbal assault, ethical misconduct, denial of her rights to free speech and assembly, retaliatory harassment and constitutional torts involving rights to liberty, property and freedom of the press from prior restraint.

48. Plaintiff has pleaded a cause of action for fraudulent inducement in sufficient detail to clearly inform Defendants that they knowingly made a misrepresentation to the Plaintiff in informing her they would not impede her from looking for future employment when they coerced her into resigning. A claim for a prima facie tort requires: "1) the intentional infliction of harm, 2) which results in special damages, 3) without any excuse or justification, 4) by an act or series of acts which would otherwise be lawful." Freihofer v

9

Hearst Corp., 65 N.Y.2d 135, 142-3 (1985). Fraudulent inducement requires a plaintiff to "assert the misrepresentation of a material fact, which was known by the defendant to be false and intended to be relied on when made, and that there was justifiable reliance and resulting injury." Braddock v Braddock, 60 A.D.3d 84, 86 (1st Dep't 2009). In the case at bar the alleged misconduct was based upon hearsay and an unfair investigation into the charges. Plaintiff was not given any consideration of her innocence.

Courts have accepted a number of motives as objectively sensible reasons for charging tenured teachers. The most prominent of these reasons is a reduction in force because tenured teachers are usually expensive. Adverse economic conditions, even if the employee is not at fault for these conditions, constitute just cause for making up charges. In addition, employers have satisfied the just cause requirement when the employee fails to meet performance standards, or engages in conduct that injures the employer's reputation or interests. This may include public advocacy of illegal behavior. Other just cause reasons for terminating an employee include intoxication, severe personality conflicts, criminal acts against the employer, lateness and absences, and insubordination. Although many just cause reasons exist, the question of the role of the judicial factfinder in a just cause dispute remains unresolved. In other words, to whom should the proffered reasons for discharge be considered objectively reasonable? On the one hand, the employer is the sole judge of its own reasonableness. In Simpson v. Western Graphics Corp., Western Graphics discharged Simpson for violently threatening another employee. Simpson, whose employment was covered by a just cause provision in an employee handbook, denied making the threats.
Simpson argued that a court should determine whether he did in fact threaten the other employee. The court reasoned that the handbook was a unilateral self-imposed restriction by the employer and no statement was ever made relinquishing its power to determine whether facts constituting cause for termination existed.
The court stated that the employer agreed to govern itself by the just cause standard, but "did not agree to a secondary level of fact-finding authority." The court concluded that it did not have to determine whether just cause actually existed because that discretion rested with the employer alone. As a result, the court refused to question the employer's decision.
 The subjective test of the Simpson decision allows employers to retain broad managerial discretion when choosing whether to terminate their employees. The Simpson decision, however, creates troubling implications for employees challenging their employers' good cause decisions. Employers only need to articulate a good faith belief that a just cause to terminate exists. The employer has no responsibility to conduct a meaningful investigation or document relevant behavior that would justify its decision. An employer may be tempted to cloud an illicit motive by stating a false reason that complies with just cause requirements. The difficulty of establishing proof of an employer's disingenuous intent makes the incentive to lie all the more powerful. As a result, employers under Simpson benefit from increased employee loyalty obtained by a just cause regime without the accompanying burdens. Just cause becomes an illusory subjective standard. A contrary understanding of just cause proposes submitting the employer's decision to de novo review by a factfinder. A judge or jury would reach an objective independent determination of whether the employer's proffered reason really occurred. The most

prominent case advocating this standard is Toussaint v. Blue Cross & Blue Shield of Michigan. Toussaint was a middle level manager who was assured before commencing employment that as long as he performed his job he would not be terminated. Toussaint was terminated because of alleged personality conflicts with other employees and insubordination in a meeting with executives. The court concluded that, at least for discharges based upon misconduct, the jury must determine whether the employee actually committed the infraction alleged by the employer.

An independent factual review of just cause determinations significantly benefits employees. Just cause employees have protections similar to their civil service and unionized counterparts-independent review of an employer's decision by a neutral third party or a group of peers, as the matter herein reviewed. Such a secondary level of factfinding, however, significantly infringes upon employers' prerogative to shape and design their workforce. De novo review of just cause allows the jury to override the conclusions of the employer. The factfinder becomes the equivalent of a supervising employment panel that could comment upon virtually any just cause decision. This could create a chilling effect on an employer's managerial discretion.

In Baldwin v. Sisters of Providence in Washington, Inc., the plaintiff worked as a respiratory therapist for the defendant hospital, where he was subject to an employee handbook that limited terminations to instances of "gross violation of conduct." The plaintiff was accused of molesting a patient. After an investigation, the plaintiff was discharged. The trial court entered judgment in favor of the plaintiff. On appeal, the defendant argued that the trial court's jury instruction on just cause was improper because it only incorporated an objective standard, making the jury the sole determiner of whether just cause existed. The Washington Supreme Court agreed with the defendants and adopted a mixed test that limited the discretion of the employer with the evaluation of the factfinder.

 The court concluded:

We hold "just cause" is a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power. Furthermore, a discharge for "just cause" is one which is not for any arbitrary, capricious, or illegal reason and which is one based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true.

In the matter cited herein the facts were omitted and ignored. The case at bar was made up by a student in a private school who would not press charges or testify. The case was closed. Then the Defendants decided to pursue termination, and denied all the rights of Plaintiff to her teaching position in order to remove her from the Department of Education.

49.  To state a claim for defamation in New York a pleading must allege "a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and it must either cause special harm or constitute defamation per se." Dillon v City of New York, 261 A.D.2d 34, 38 [1st Dept 1999].  Although Plaintiff was accused of causing the Department undue notoriety in the news, this was never discussed, proven or substantiated. Also, Plaintiff did not contact the media, the Department did. Thus it was the Defendants themselves who caused their own notoriety, if any could be proven to exist. No proof has been submitted.

50. Defendants in so doing intentionally inflicted harm on the plaintiff, including but not limited to the loss of her seventeen-year position with the Department. Dillon v City of New York, 261 A.D.2d 34, 38 [1st Dept 1999]; *accord* Saluatore v Kumar, 45 AD3d 560, 563 [2d Dept 2007], *lv denied* 10 NY3d 703 [2008]). Defendants spreading the fiction that Plaintiff had committed an act of sexual harassment and making that fiction known sounds in defamation. Thus Plaintiff has a cause of action sounding in prima facie tort for strictly wrongful discharge, in addition to her being hampered in finding any future employment as a result of deliberate and false claims made against her.

51. Plaintiff argues that she was wrongfully, recklessly, arbitrarily and unfairly induced to sign her resignation. The First Department in Braddock, found that to state a claim for fraudulent inducement "a plaintiff must assert the misrepresentation of a material fact, which was known by the defendant to be false and intended to be relied on when made, and that there was justifiable reliance and resulting injury." Braddock v Braddock, 60 A.D.3d 84, 86 (1st Dep't 2009). Here, Plaintiff successfully has met all the elements for fraudulent inducement needed in a pleading. CPLR 3016 (b) requires that fraud claims be "stated in detail," but only requires that there be "sufficient detail to clearly inform a defendant with respect to the incidents complained of and is not to be interpreted so strictly as so prevent an otherwise valid cause of action in situations where it may be impossible to state in detail the circumstances constituting the fraud." Pike v NY Life Ins.,72 A.D.2d 1043, 1050 (2d Dept. 2010). In Pike, the court held that the plaintiff's complaint was pleaded with adequate specificity when the plaintiff, in his complaint and in supplemental affidavits, described the misrepresentations in sufficient detail to conform to a "clearly inform" standard.

52. Defendants made knowing misrepresentations of present material fact to Plaintiff intended to deceive her and which induced her to act upon the misrepresentations with resultant damages.

53. Clearly, giving these facts "every favorable inference to determine whether any cognizable legal theory can be discerned" Plaintiff has stated a cause of action for fraudulent inducement, denial of procedural and substantive due process rights, and harassment. A false representation of a matter of fact—whether by words or by conduct, by false or misleading allegations, or by concealment of what should have been disclosed—that deceives and is intended to deceive another so that the individual will act upon it to her or his legal injury is clearly present here. Fraud is commonly understood as dishonesty calculated for advantage. A person who is dishonest may be called a fraud. In the U.S. legal system, fraud is a specific offense with certain features. Fraud can be proved in the case at bar by the Defendants' actions involved five separate elements: (1) a false statement of a material fact,(2) knowledge on the part of the defendant that the statement is untrue, (3) intent on the part of the defendant to deceive the alleged victim, (4) justifiable reliance by the alleged victim on the statement, and (5) injury to the alleged victim as a result. All can be seen in the case at bar, pursued with bad faith by Defendants. Federal and state criminal statutes provide for the punishment of persons convicted of fraudulent activity.

FIRST CAUSE OF ACTION

12

Violation/Interference with Constitutionally Protected Rights – 1st, 5th, 7th & 14th Amendments; 42 U.S.C §1983 et seq.; Freedom of Speech and Association; Due Process and Equal Protection Rights;

54. Plaintiff repeats an re-alleges each and every allegation contained in paragraphs 1 through 53 as though fully set forth herein.

55. The conduct and actions of Defendants in retaliating against Plaintiff and subjecting her to ethical misconduct, violations of due process, and equal rights under the U.S. Constitution and the laws of the State and City of New York, were and continue to be unlawful, oppressive and a malicious attempt to retaliate against her in violation of 42 U.S.C §1983, TITLE 42 CHAPTER 21 SUBCHAPTER I § 1985(2), (3), the First, Fifth, Seventh and Fourteenth Amendments to the Constitution, Civil Rights Law §79-h, Article I, § 8 of the New York State Constitution, Title 28: part iv; chapter 85; § 1343, and 28 U.S.C. §1331,28 U.S.C §1367, Judiciary Codes of Conduct, Judiciary Law §487, Title VII and other State law claims..

56. Defendants' infringement upon and violation of Plaintiff's rights protected under the statutes listed above was and is intended to harm Plaintiff.

57. Defendants' conduct and actions are intentional, malicious, taken with deliberate indifference and or reckless disregard for the natural and probable consequences., without lawful justification or reason.

58. As a direct result of Defendants actions described herein, Plaintiff has suffered and continues to suffer trauma, emotional distress, mental anguish, loss of income, and loss of potential employment anywhere.

59. As a result of the Defendants' crusade to maliciously harm Plaintiff, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish  and is entitled to damages sustained to date and continuing in excess of $2 million dollars as well as punitive damages and costs.

## SECOND CAUSE OF ACTION
### Intentional and Negligent Infliction of Emotional Distress , Verbal Harassment, With Unjustified Threats of Future Harm

60. Plaintiff repeats and re-alleges each of the allegations as set forth above in paragraphs 1 through 59 inclusive, of this Complaint, with the same force and effect as though herein fully set forth.

61. Plaintiff was subjected emotional and psychological dangers and intimidation. Plaintiff has been subjected to extreme and outrageous conduct by Defendants, whose intent is to cause – or recklessly disregard the substantial probability of causing – severe emotional distress; severe emotional distress to the plaintiff is shown to be proximately caused by the Defendants' conduct; damages have been severe. These acts created an unreasonable risk of causing the Plaintiff emotional and physical distress; the Plaintiff's distress was foreseeable; the defendants' conduct was the cause of the Plaintiff's distress; and facts show there is a breach of direct duty of care to the Plaintiff.

62. As a result of this retaliation, intimidation, and abuse, Plaintiff has been irrevocably harmed both emotionally and physically, and demands judgment against Defendants an amount more than $2 million, or to be determined by a jury of his peers.

THIRD CAUSE OF ACTION
42 U.S.C. §1983 – STATE AND MUNICIPAL VIOLATIONS;
Deprivation of Rights Under Color of Law; Misrepresentation
New York State Civil Rights Law §§70, 75-b, 79-h; violations
of Education Law 3020-a

63. Plaintiff repeats and re-alleges the allegations et forth in paragraphs 1 through 62 inclusive, of this Complaint, with the same force and effect as though herein fully set forth.

64. Defendants, acting under color of law, have engaged in a course of action and behavior rising to the level of a policy and condoned practice, and this has deprived Plaintiff of her rights secured by the Constitution and laws in violation of 42 U.S.C. §1983, §§1341, 1342.

65. It can be said that to condone lies, false documentation, retaliation and other such acts is contrary to Municipal Law and Public Officers Law; in this matter, Education Law 3020-a was violated in that there was no proper determination of probable cause before the June, 2012 3020-a Hearing before Arbitrator Eleanor Glanstein.

66. At the Plaintiff's 3020-a arbitration hearing reviewed herein, the New York City Department of Education ("employer") bore the burden of proving the charged misconduct by a preponderance of the evidence, failed to meet this burden, and failed to address the violation of rules, regulations and law pursuant to Education Law 3020-a(2)(a) which requires a vote in an Executive Session by the school board before the [Respondent] received the specifications. Matter of Martin v Ambach, 67 N.Y.2d 975, 502 N.Y.S.2d 991 (1986).

67. As this Executive Session never took place, and as Principal Gogliormella "found" probable cause without any authority to do so, Arbitrator Eleanor Glanstein never had subject matter jurisdiction to proceed with a hearing. Yet in the Post-Charge Stipulation of Settlement the caption states "Pursuant to Education Law §3020-a"; the first paragraph states:

"WHEREAS,  the Department of Education of the City School District of the City of New York, (hereinafter "Department") has preferred disciplinary charges against Lisa Guttilla (hereinafter "Respondent"), file number 729002, a tenured teacher employed by the Department, pursuant to *Education Law Section 3020-a*;" (EXHIBIT 5, p. 1)

68. As a tenured teacher, Plaintiff possessed a constitutionally protected property interest in her position of employment which could not be diminished in any manner without her being accorded substantive fair hearing and due process rights, as well as a just and fair penalty for proven misconduct. See Cleveland Board of Educ. V Loudermill, 470 U.S. 532, 105 S. Ct. 1487 (1985); Kinsella v Board of Educ. Of Central School District No. 7, 378 F. Supp. 54 (W.D.N.Y. 1974); Matter of Elmore v Plainview-Old Bethpage Central School District, Board of  Education, 273 A.D.2d 307, 708 N.Y.S.2d 713, 714 (2d Dep't 2000) (stating that tenured teacher has protected property interest in his position which raises due process considerations whenever teacher is faced with termination); Matter of Soucy v Board of Educ. Of North Colonie Central School Dist. No. 5, 41 A.D.2d 984, 343 N.Y.S.2d 624 (3rd Dep't 1973) (stating that right of tenured teachers to a fair hearing and due process were substantive rights which could not be denied).

69. A tenured teacher cannot be disciplined or removed without Just Cause. The "Just Cause" standard encompasses seven (7) elements, all of which must be proven to justify the imposition of discipline upon a pedagogue:

(1) proper and timely notice to the employee of the rules and procedures with which the employee is expected to comply and the possible or probable consequences of the employee's failure to comply with the rules and procedures;

(2) reasonable rules and orders must not conflict with either a provision of the collective bargaining agreement or with established past practice, reasonably relate to legitimate management objectives, cannot be arbitrary, capricious or discriminatory, and must not purport to control how an employee lives his/her private life;

(3) timely and thorough investigation wherein the employer promptly informed the employee of the charges against him and the employee was given a chance to tell his side of the story before the imposition of disciplinary charges;

(4) fair investigation conducted in an objective manner that gathered and reviewed all relevant facts;

(5) proof of the employer meeting the burden of proving the charges preferred against the employee by a preponderance of the evidence;

(6) equal treatment – the employer applied the rules, procedures, orders and penalties even-handedly and equally to all employees;

(7) penalty – the degree of discipline which the employer seeks to have imposed must be reasonably related to the seriousness of the employee's proven offense and the record of the employee in his service with the employer.

See Enterprise Wire Co., 46 LA 359 (Daugherty 1966); Adolph Coven, Susan Smith, and Donald Farwell, Just Cause: The Seven Tests (BNA Books, 2006).

70. The statute of tenure rights cannot be changed, altered, or in any way abrogated by an arbitrator, thus Glanstein did not have the jurisdiction to hear the case or settle with a stipulation, any of the charges alleged in this matter against the Plaintiff. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish  and is entitled to damages sustained to date and continuing in excess of $2 million dollars as well as punitive damages and costs.

## FIFTH CAUSE OF ACTION
### Abuse of Process

71. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 70 inclusive, of this Complaint, with the same force and effect as though herein fully set forth.

73.  Defendants, and each of them conspired to deprive Plaintiff of her First, Fifth, Seventh and Fourteenth Amendment rights, and jointly caused such deprivation of rights by acting in concert to unlawfully bring harm, distress, and economic ruin to Plaintiff as described above.

74. Such actions by Defendants denied Plaintiff equal protection under the law, and her rights are guaranteed under U.S.C. §§ 1983, 1985, and the Fourteenth Amendment of the US Constitution.

75. As a result of the Defendants' crusade to maliciously harm Plaintiff, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as

damages for mental anguish and is entitled to damages sustained to date and continuing in excess of $5 million dollars as well as punitive damages and costs.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that the Court enter judgment and an Order:
[A] First Cause of Action: in excess of $2 million dollars as well as punitive damages, and costs.

B] Second Cause of Action: in excess of $2 million dollars as well as punitive damages, and costs.

C] Third Cause of Action: in excess of $2 million dollars as well as punitive damages, and costs.

D] Fourth Cause of Action: in excess of $2 million dollars as well as punitive damages, and costs.

E] Fifth Cause of Action: in excess of $5 million dollars as well as punitive damages, and costs.

E] A declaratory judgment stating that Defendants willfully violated Plaintiff's rights secured by federal and state laws as alleged herein.

F] Injunctive relief: an injunction requiring Defendants to correct, and cease all present and past violations of federal and state law as alleged herein; to enjoin Defendants from continuing to act in violation of federal and state law as stated herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws;

G] Awarding Plaintiff punitive damages against all individual defendants, sued herein both in their official as well as individual capacities.

H] An Order granting such other legal and equitable relief as the court deems just and proper.

## JURY TRIAL IS DEMANDED

Plaintiff demands a trial by jury on all claims so triable.
Dated: New York, New York
      October   2013

                                    Respectfully Submitted,

                                    Lisa Guttilla

EXHIBIT 1

CITY OF NEW YORK

# THE SPECIAL COMMISSIONER OF INVESTIGATION
# FOR THE NEW YORK CITY SCHOOL DISTRICT

80 MAIDEN LANE, 20TH FLOOR

NEW YORK, NEW YORK 10038

RICHARD J. CONDON
SPECIAL COMMISSIONER

TELEPHONE: (212) 510-1400
FAX: (212) 510-1550
WWW.NYCSCI.ORG

April 19, 2012

Hon. Dennis M. Walcott
Chancellor
New York City Public Schools
Department of Education
52 Chambers Street, Room 314
New York, NY 10007

Re:     **Lisa Guttilla**
        **SCI Case No. 2011-4102**

Dear Chancellor Walcott:

An investigation conducted by this office has substantiated that Lisa Guttilla, a 37-year-old Department of Education ("DOE") teacher at James Madison High School in Brooklyn, had inappropriate sexual contact with a 14-year-old female student ("Student A") enrolled at Poly Prep Country Day School ("Poly"), a private school in Brooklyn where Guttilla was employed part-time as a volleyball coach.[1]

In September 2011, Deputy Counsel Theresa Europe, Director of the Administrative Trials Unit of the DOE Office of Legal Services, contacted the Office of the Special Commissioner of Investigation ("SCI") and requested an investigation into allegations that Guttilla had inappropriate sexual contact with an unidentified private school student, age 14. Guttilla was the student's volleyball coach.

An SCI investigator contacted Assistant District Attorney Ana Krutaya of the Sex Crimes Bureau at the Kings County District Attorney's Office. Krutaya reported that her office had closed a case concerning Guttilla and Student A.

SCI investigators interviewed Student A's mother ("Mother A"). She reported that in September 2009, Student A, who was enrolled at Poly, became manager of Guttilla's volleyball team at the school. Mother A said that she had known Guttilla since 2000, and that the teacher frequently gave Student A rides home after team practices. According to Mother A, in the fall of 2009, she discovered that Student A sent a "love letter" to Guttilla via Facebook, the social networking site. Student A told her mother

---

[1] Guttilla has been reassigned by the DOE; she is no longer employed at Poly. Guttilla has since turned 39; Student A is now 16.

Hon. D. M. Walcott                    -2-                    April 19, 2012

that she intended to send the letter to another person, but that she sent it first to Guttilla for her to review. Mother A described a subsequent incident in which she telephoned her daughter, who said that she was at home after receiving a ride from Guttilla. Mother A arrived home soon after their call, and discovered that Student A was not present. Mother A then telephoned Guttilla and told her of her daughter's deception. On a weekday in January 2010, Student A returned home with a "hickey," or bruise. Mother A questioned her daughter about the source of the bruise, and found her responses to be "somewhat evasive." The mother informed Guttilla, and the teacher responded, "Give the kid a break; maybe she got [the bruise] while working out." Mother A took Student A's mobile phone, intending to examine her daughter's calls and messages. The girl then acknowledged to her mother that she had been in a relationship with Guttilla, who had asked the student to be her "girlfriend." According to Mother A, her daughter told her that she and Guttilla had touched each other's breasts and buttocks over their clothing, and kissed each other. Student A told her mother that these encounters usually occurred in a girls' bathroom at Poly.

Mother A telephoned Guttilla about Student A's admissions. Guttilla said that she was "sorry," and that her sexual relationship with Student A was a "stupid mistake." Guttilla told Mother A that she would withdraw money from her bank account to pay her in return for not reporting the matter. Mother A said that on the day following this conversation, she contacted the New York City Police Department ("NYPD"). She said that Student A told NYPD Detective Velazco about Guttilla's sexual relationship with her. Mother A said that she and her daughter had experienced "a great deal of emotional stress" due to Guttilla's conduct. Citing concern for Student A's well-being, which Mother A described as "improving, but fragile," she declined to allow her daughter to be interviewed by SCI investigators.

SCI investigators interviewed Detective Luis Velazco of the NYPD Brooklyn Special Victims Squad. Velazco said that he investigated Guttilla based upon a complaint by Student A, and that the case was subsequently closed. Velazco interviewed Student A, and he described to SCI investigators the student's account of her contacts with Guttilla on several occasions at Poly. His description comported with Student A's admissions to her mother as described above.

A review of Student A's mobile telephone records, for the period of December 1, 2009 through January 20, 2010, revealed 9,399 text messages and 305 calls between Student A's phone and a number subscribed to by Guttilla. Some of the text messages and calls were late at night and on weekends.[2] A review of records for the mobile telephone subscribed to by Guttilla showed 188 calls between Guttilla and Student A from October 22, 2009 through December 1, 2009. These occurred before, during, and after school hours, including on weekends.[3]

---

[2] Records prior to December 1, 2009 were no longer available.
[3] The records pertaining to Guttilla's telephone did not include text messages.

Hon. D. M. Walcott                        -3-                        April 19, 2012

Through counsel, Guttilla declined the opportunity to be interviewed by SCI investigators concerning this matter.

Lisa Guttilla, a DOE teacher, had inappropriate sexual contact with a 14-year-old female student at a private school where Guttilla was employed part-time as a coach. On multiple occasions, she and the student kissed each other and touched each other's breasts and buttocks (over their clothing) in a school bathroom. We recommend that Guttilla's employment be terminated, that she be made ineligible for work with the DOE, and that this matter be taken into account should she apply for any position with the DOE or its affiliates in the future.

We are sending a copy of our report and of our recommendations to the Office of Legal Services and the New York State Education Department. Should you have any inquiries concerning this matter, please contact Deputy Commissioner Gerald P. Conroy, the attorney assigned to this case. Please advise Deputy Commissioner Conroy within 30 days of receipt of this letter what, if any, action has been taken or is contemplated with respect to Lisa Guttilla. Thank you for your attention to this matter.

Sincerely,

RICHARD J. CONDON
Special Commissioner
of Investigation for the
New York City School District

By: _____

Gerald P. Conroy
Deputy Commissioner

RJC:GPC:gm
c:      Michael Best, Esq.
        Theresa Europe, Esq.

CITY OF NEW YORK

## THE SPECIAL COMMISSIONER OF INVESTIGATION

## FOR THE NEW YORK CITY SCHOOL DISTRICT

### INVESTIGATOR'S FINAL REPORT

**Case #:** 2011/4102

**Case Type (code #):** 1400/ 1450

**Case Type (description):** Sexual Abuse/ Physical Contact – Inappropriate Relationship

**Subject's Name:** Lisa Guttilla

**School:** 425K

**Subject's Position:** Teacher

**District:** 22

**Subject's Social Security #:** 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

**Subject's DOE File #:** 729002

**Investigator:** Jeffrey Anderson

**Approved by:** Louis Torrellas

**Findings:**

The allegation, received at the Office of the Special Commissioner of Investigation ("SCI") on September 7, 2011, from Counselor to the Chancellor, Theresa Europe, that James Madison High School (425K) teacher and former Volleyball Coach at Poly Prep Country Day School, Lisa Guttilla, had inappropriate sexual contact with Student A, then a fourteen year old female at Poly Prep Country Day School, is substantiated.

On September 20, 2011, Investigator Anderson spoke with ADA Ana Krutaya of the Sex Crimes Bureau at the Brooklyn District Attorney's Office, which had closed a case concerning Lisa Guttilla and Student A.

On October 14, 2011, SCI investigators interviewed Mother A. Mother A stated that Student A attended Poly Prep Country Day School in September of 2009. Mother A stated that in September of 2009, Student A became a manager for Guttilla's Volleyball team at Poly Prep. Mother A stated that sometime in the fall of 2009, she discovered that Student A sent a "love letter," via facebook, to Guttilla. Mother A stated that on January 20, 2010, she received a call from Father A who stated that Student A came home with a "hickey." Mother A stated that Student A told her that she was in a relationship was with Guttilla. Mother A stated that Student A told her that Guttilla asked Student A to be her girlfriend. Mother A stated that Student A told her that she and Guttilla touched each others breasts and buttocks (over clothes) and kissed each other, usually in the girl's bathroom, at Poly Prep Country Day School. Mother A stated that she subsequently had telephone conversations with Guttilla about Guttilla's sexual relationship with Student A and that Guttilla stated that she was "sorry" and that Guttilla's sexual relationship with Student A was a "stupid mistake." Mother A stated that Guttilla told Mother A that she would go to the bank and withdraw money to give to Mother A so that Mother A would not report the relationship between Guttilla and Student A. Mother A stated that the following day, she reported the matter to the Police. Mother A stated that Student A told Detective Velazco about the sexual relationship that Guttilla maintained with her.

On October 26, 2011, SCI investigators interviewed Detective Luis Velazco of the NYPD Brooklyn Special Victims Squad. Detective Velazco stated that he investigated NYC DOE teacher Lisa Guttilla based upon a complaint by Student A, and that the case was subsequently closed. Detective Velazco stated that Student A attended Poly Prep Country Day School and that Guttilla was also a volleyball coach at Poly Prep Country Day School. Detective Velazco recalled that he interviewed Student A, who told him that on several occasions she and Guttilla kissed each other and touched each other on the breasts and buttocks (over the clothes) in a bathroom at Poly Prep Country Day School.

On December 16, 2011, Investigator Anderson examined Student A's cell phone records obtained upon subpoena and learned that from December 1, 2009 through January 20, 2010 there were nine thousand three hundred ninety nine (9399) text messages and three hundred and five (305) calls between Student A and Guttila's phone numbers. The text messages and calls included late night and weekend contact. Records prior to December 1, 2009 were no longer available.

On January 10, 2012, Investigator Anderson examined Lisa Guttilla's cell phone records, obtained upon subpoena, which did not include text messaging. Investigator Anderson noted that from October 22, 2009 through December 1, 2009, Guttilla and Student A exchanged a total of 188 telephone calls. The calls occurred before, during, and after school hours and also on weekends.

At the request of Mother A, Student A was not interviewed by SCI investigators.

Through her attorney, Donald Vogelman, Lisa Guttilla declined to be interviewed by SCI investigators.

During this investigation, Lisa Guttilla was re-assigned to DOE administrative offices at 715 Ocean Terrace, Staten Island, NY.

## NYDailyNews.com
# DAILY☆NEWS

Get Morning Home Delivery of the Daily News for up to 70% off.
Call (888) 393-3760

# Another 'Horndog High' sex charge: Teacher Lisa Guttilla arrested for feeling up 14-year-old girl

BY Henrick Karoliszyn and Christina Boyle
DAILY NEWS WRITERS

Thursday, January 28th 2010, 4:36 AM



The latest 'Horndog High' scandal involves Madison High gym teacher Lisa Guttilla, 37.

It seems like sex ed is the only thing on the curriculum at Brooklyn's Horndog High.

New shenanigans have come to light at James Madison High School, where two teachers were recently caught naked in a classroom and another was punished for getting too close to a student.

The latest scandal involves Madison High gym teacher Lisa Guttilla, 37, who was arrested Friday for feeling up a 14-year-old girl, police sources said.

The student attended private Poly Prep Country Day School, where Guttilla was a part-time volleyball coach.

The abuse came to light when the teen's mother started asking questions about a hickey on her neck - and she confessed to sexy sessions with Guttilla between Jan. 4 and 9.

A complaint filed in Brooklyn Criminal Court says the teacher did "touch, grab, squeeze and kiss the [girl] about the breast and buttock."

Guttilla was charged with sexual abuse and child endangerment and sent to the "rubber room" - a reassignment center for teachers under investigation.

"She is a teacher at Madison, and she has

Advertisement



Help people in need.
Donate your car, boat or RV
Free Towing ▪ Tax Deductible

FREE
3 day vacation to over
80 destinations.

Call Toll-Free
1-877-225-9384

Heritage
for the Blind

Print Powered By ⟨FD⟩ FormatDynamics™


NYDailyNews.com
**DAILY NEWS**

Get Morning Home Delivery of the Daily News for up to 70% off.
Call (888) 393-3760

been reassigned," said Education Department spokeswoman Margie Feinberg

The allegations against Guttilla are the latest to rock the Midwood high school where she worked.

In December, Madison foreign-language teachers Alini Brito and Cindy Mauro were found undressed in an empty classroom and sent to the rubber room.

Social studies teacher Allison Musacchio is under investigation for having an inappropriate relationship with a male Madison student.

And a teacher has accused Assistant Principal Michael Edelman of sexual harassment.

cboyle@nydailynews.com

With Scott Shifrel

Advertisement



**Save up to $500**
on your auto insurance.

Get A Free Quote
**AutoInsureUSA.net** ▶

AUTOINSURE USA

Print Powered By  FormatDynamics



Updated: Thu., Jan. 28, 2010, 11:36 PM

# Law bites 'sex' coach

By JAMIE SCHRAM and MARC RAIMONDI

*Last Updated:* 11:36 PM, January 28, 2010
*Posted:* 3:12 AM, January 26, 2010

A girls volleyball coach at an elite Brooklyn private school was busted after her smooching sessions left a 14-year-old player with a telltale hickey, authorities said yesterday.

The Poly Prep Country Day School student confessed to the affair with coach Lisa Guttilla, 37, after her mother demanded to know who left the love bite on her neck.

Guttilla, who worked part time at Poly Prep, engaged in sexual conduct with the victim on at least three occasions, authorities said.

She is charged with misdemeanor sexual abuse and endangering the welfare of child.

NEW YORK POST is a registered trademark of NYP Holdings, Inc.
NYPOST.COM , NYPOSTONLINE.COM , and NEWYORKPOST.COM are trademarks of NYP Holdings, Inc.
Copyright 2010 NYP Holdings, Inc. All rights reserved. Privacy | Terms of Use

EXHIBIT 2

NEW YORK STATE EDUCATION DEPARTMENT
- - - - - - - - - - - - - - - - - - X
In the Matter of The Disciplinary
Charges Proffered by                    X

THE NEW YORK CITY DEPARTMENT OF         X
EDUCATION

                                        X

            "Department"        Re: PROBABLE CAUSE
                                        X   HEARING
        -against-                           (Opinion
                                        X   Regarding Award
LISA GUTTILLA                               of March 22, 2010)

                                        X
            "Respondent"

                                        X
Pursuant to Education Law §3020-a
- - - - - - - - - - - - - - - - - - X


**APPEARANCES**


        **FOR THE DEPARTMENT**
        MICHAEL BEST, ESQ., GENERAL COUNSEL TO THE CHANCELLOR
            Jordana Shenkman, Esq., Of Counsel


        **FOR THE RESPONDENT**
        JAMES R. SANDNER, ESQ.
            Steven Friedman, Esq., Of Counsel


**BEFORE:**   Martin F. Scheinman, Esq., Probable Cause Arbitrator

**BACKGROUND**

Pursuant to the Collective Bargaining Agreement ("Agreement") between the Board of Education (now Department of Education) ("Department") and the United Federation of Teachers ("Union"), I am designated to serve as the "Probable Cause Arbitrator". In this capacity, I was contacted regarding Respondent, Lisa Guttilla, and the Department's request in accordance with the parties' Agreement for her removal from the payroll for a term of two (2) months subject to my finding there is probable cause to believe Respondent committed the allegations against her and such actions constitute "serious misconduct".

Under the terms of the Agreement, "(p)robable cause exists when evidence or information which appears reliable discloses facts or circumstances making it likely that such conduct occurred and that such person committed the conduct". Serious Misconduct is defined as:

1)   the felony sale, possession, or use of marijuana, of a controlled substance, or a precursor of a controlled substance or drug paraphernalia as defined in Article 220 or 221 of the Penal Law, or

2)   any crime involving physical or sexual abuse of a minor or student,

3)   any felony committed either on school property or while in the performance of teaching duties, or

2

    4)    any felony involving firearms as defined in Article
          265 of the Penal Law.

In a subsequent Memorandum of Agreement ("MOA"), dated

October 3, 2005, the parties added the following language:

> A tenured pedagogue who has been charged under
> the criminal law or under §3020-a of the New York
> State Education Law with an act or acts constituting
> sexual misconduct (defined below) shall be suspended
> without pay upon a finding by a hearing officer of
> probable cause that sexual misconduct was committed.
>
> A rebuttable presumption of probable cause shall exist
> where the Special Commissioner of Investigations
> ("SCI") substantiates allegations of sexual
> misconduct, or a tenured pedagogue has been charged
> with criminal conduct based on act(s) of sexual
> misconduct.
>
>    *       *       *       *       *       *
>
> For purposes of this section, sexual misconduct
> shall include the following conduct involving a
> student or a minor who is not a student: sexual
> touching, serious or repeated verbal abuse (as
> defined in Chancellor's Regulations) of a sexual
> nature, action that could reasonably be interpreted as
> soliciting a sexual relationship, possession or use of
> illegal child pornography, and/or actions that would
> constitute criminal conduct under Article 130 of the
> Penal Law against a student or a minor who is not a
> student.

A hearing was held on March 18, 2010, at the Department's

Offices in New York City.  At that time, both parties were

afforded full opportunity to introduce evidence and argument in

support of their respective positions. They did so consistent

with the following negotiated procedures:

        To establish probable cause, the

> investigator assigned to the matter
> must be present and testify under oath
> before the arbitrator.  The Board may
> also be required to produce signed
> statements from the victim or
> witnesses, if any.
> Thereafter, the Respondent shall have
> an opportunity to respond orally to the
> offer of proof.  The arbitrator may ask
> relevant questions or may make further
> inquiry at the request of Respondent.
> The hearing shall not require testimony
> of witnesses nor shall cross-
> examination be permitted.[1]

At the close of the hearing, the parties agreed I should promptly issue my Award on probable cause and, thereafter, following my receipt of the transcripts of the hearings, issue my full Opinion.  In accordance with that agreement, on March 22, 2010, I issued by e-mail the following Award:

> **Dear Ms. Shenkman and Mr. Friedman:**
>
> **In accordance with the arrangements made at the hearing on March 18, 2010, I hereby make my ruling as Probable Cause Arbitrator pursuant to the parties' language regarding the Department's request I find probable cause to believe Ms. Lisa Guttilla committed "Serious Misconduct". As agreed, my full Opinion shall follow after I have received the transcript of the hearing.**
>
> **The Department alleges Ms.Gutilla engaged in serious misconduct as defined in Section b of the parties' Agreement. Specifically, the Department alleges Ms. Guttilla has committed sexual touching of a minor which constitutes criminal behavior.**

---

[1]  Article 21(G)(5), Joint Exhibit No 1.

4

I find the Department has established probable cause based upon the documents submitted by the Department which establish Guttilla's arrest having been charged with several counts of "sexual abuse in the third degree" with a minor. (Department's Exhibit No. 1). There is probable cause to believe Ms. Guttilla engaged in actions which constituted serious misconduct as defined in Section b, Sexual Offenses Involving Students. Ms. Guttilla's alleged conduct falls within the definition of serious misconduct which, "include the following conduct involving a student or a minor who is not a student: <u>sexual touching</u>, serious or repeated verbal abuse (as defined in Chancellor's Regulations) of a sexual nature, action that could reasonably be interpreted as soliciting a sexual relationship, possession or use of illegal child pornography, and/or <u>actions that would constitute criminal conduct under Article 130 of the Penal Law</u> against a student or a minor who is not a student."(Emphasis Added).

Accordingly, consistent with the parties' Agreement, Ms. Guttilla shall be removed from the payroll.

Martin F. Scheinman, Esq.
Probable Cause Arbitrator

<u>Opinion</u>

The pending criminal charges against Respondent are as follows:

CRIMINAL COURT OF THE CITY OF NEW YORK
PART AP-4   COUNTY OF KINGS
---------------------------------------X    STATE OF NEW YORK
THE PEOPLE OF THE STATE OF NEW YORK         COUNTY OF KINGS

        - against -

LISA M GUTTILLA
---------------------------------------X

5

ASSISTANT DISTRICT ATTORNEY OLATOKUNBO OLANIYAN OF THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE SAYS THAT ON OR ABOUT (1) AND BETWEEN JANUARY 04, 2010 03:30 PM AND JANUARY 09, 2010 03:30 PM AT 9216 7TH AVENUE COUNTY OF KINGS, STATE OF NEW YORK,

THE DEFENDANT COMMITTED THE OFFENSE(S) OF:

PL 130.55    SEXUAL ABUSE IN THE THIRD DEGREE (DQO) (5 COUNTS)

AND THAT, ON OR ABOUT (2) AND BETWEEN JANUARY 10, 2010 03:30 PM AND JANUARY 16, 2010 03:30 PM AT 9216 7TH AVENUE COUNTY OF KINGS, STATE OF NEW YORK,

THE DEFENDANT COMMITTED THE OFFENSE(S) OF:

PL 130.55    SEXUAL ABUSE IN THE THIRD DEGREE (DQO) (5 COUNTS)

AND THAT, ON OR ABOUT (3) AND BETWEEN JANUARY 17, 2010 03:30 PM AND JANUARY 20, 2010 03:30 PM AT 9216 7TH AVENUE COUNTY OF KINGS, STATE OF NEW YORK,

THE DEFENDANT COMMITTED THE OFFENSE(S) OF:

PL 130.55    SEXUAL ABUSE IN THE THIRD DEGREE (DQO) (5 COUNTS)

AND THAT, ON OR ABOUT (4) AND BETWEEN JANUARY 04, 2010 03:30 PM AND JANUARY 20, 2010 03:30 PM AT 9216 7TH AVENUE COUNTY OF KINGS, STATE OF NEW YORK,

THE DEFENDANT COMMITTED THE OFFENSE(S) OF:

PL 260.10(1)    ENDANGERING THE WELFARE OF A CHILD (DQO)

IN THAT THE DEFENANT DID

SUBJECT ANOTHER PERSON TO SEXUAL CONTACT WITHOUT THAT PERSON'S CONSENT AND SUCH OTHER PERSON'S LACK OF CONSENT WAS NOT DUE SOLELY TO INCAPACITY TO CONSENT BY REASON OF BEING LESS THAN SEVENTEEN YEARS OLD AND SUCH OTHER PERSON WAS MORE THAN FOURTEEN YEARS OLD AND THE DEFENDANT WAS LESS THAN FIVE YEARS OLDER THAN SUCH PERSON; HE KNOWINGLY ACT IN A MANNER LIKELY TO BE INJURIOUS TO THE PHYSICAL, MENTAL OR MORAL WELFARE OF A CHILD LESS THAN SEVENTEEN YEARS OLD OR DIRECT OR AUTHORIZE SUCH CHILD TO ENGAGE IN AN OCCUPATION INVOLVING A SUBSTANTIAL RISK OF DANGER TO HIS LIFE OR HEALTH.

THE SOURCE OF DEPONENT'S INFORMATION AND THE GROUNDS FOR
DEPONENT'S BELIEF ARE AS FOLLOWS:

THE DEPONENT IS INFORMED BY _____[2] THAT, AT EACH OF THE
ABOVE TIMES AND PLACES, THE DEFENDANT DID KISS INFORMANT ON THE
LIPS, TOUCH INFORMANT'S BREAST AND BUTTOCKS, AND HAVE INFORMANT
TOUCH DEFENDANT'S BREASTS AND BUTTOCKS.

THE DEPONENT IS FURTHER INFORMED BY INFORMANT THT INFORMANT'S
DATE OF BIRTH IS 06/03/1995

FALSE STATEMENTS MADE IN THIS DOCUMENT
ARE PUNISHABLE AS A CLASS A MISDEMEANOR
PURSUANT TO SECTION 210.45 OF THE PENAL
LAW.

1/29/10      /s/  O OLANIYAN
DATE              SIGNATURE

At the March 18, 2010, hearing, the Department presented a
court-certified copy of the above criminal charge filed against
Respondent.

The Department argues it has established probable cause to
believe Respondent committed serious misconduct, warranting her
removal from payroll. It contends there is no dispute she has
been arrested and charged with criminal conduct based upon acts
of sexual misconduct against a minor.

The Department maintains the criminal charges pending
against Respondent allege she engaged in sexual abuse prohibited
by Article 130 of the Penal Law. It claims the victim of

---

[2]  Name of informant blacked out on copy of Criminal Complaint
received in evidence as Department's Exhibit No. 1.

7

Respondent's actions is a fourteen (14) year old girl, born June 3, 1995. The Department insists the pendency of these criminal allegations is established by documentary evidence, in particular, the Criminal Complaint (Department's Exhibit No. 1) and Supporting Deposition (Department's Exhibit No. 2).

The Department argues the rebuttable presumption of probable cause applies by virtue of the criminal charge pending against Respondent. It contends the Agreement provides "a rebuttable presumption of probable cause shall exist where a tenured pedagogue has been charged with criminal conduct based on acts of sexual misconduct". The Department claims the presumption was not rebutted during the hearing. Accordingly, it asks I find probable cause to believe Respondent committed serious misconduct, and direct her removal from payroll consistent with the Agreement and MOA.

The Department asserts in a case such as this one, where a tenured educator has been charged with criminal conduct based upon sexual misconduct against a student or minor not a student, the Agreement does not require witnesses be produced or an investigation or substantiation by Special Commissioner of Investigations ("SCI") be shown, in order for probable cause to be found. In its view, once the requisite criminal charges are shown to be pending against an educator, probable cause is

8

established by virtue of the rebuttable presumption contained in the parties' Agreement.

Respondent, on the other hand, argues probable cause should not be found because the Department has failed to proffer any evidence it investigated the allegations against her and has not produced an investigator to testify, nor the alleged victim or the Assistant District Attorney who signed the Criminal Complaint. She also asserts the Department has failed to show the allegations against her were ever substantiated by the office of the SCI.  For these reasons, Respondent insists a finding of probable cause should not be made.

Upon my thorough consideration of the evidence and argument presented, I find probable cause exists to believe Respondent committed serious misconduct as defined in Section b, Sexual Offenses Involving Students. Her alleged behaviors fall within sexual misconduct, which the Department and Respondent's Union have defined to "include the following conduct involving a student or a minor who is not a student: sexual touching, serious or repeated verbal abuse (as defined in Chancellor's Regulations) of a sexual nature, action that could reasonably be interpreted as soliciting a sexual relationship, possession or use of illegal child pornography, and/or actions that would constitute criminal conduct under Article 130 of the Penal Law

against a student or a minor who is not a student". (Emphasis Added).

It is undisputed Respondent is charged criminally with committing Sexual Abuse in the Third Degree on several occasions in January 2010, in violation of Penal Law Section 130.55. The Criminal Complaint alleges she committed these offenses by subjecting a person born on June 3, 1995, to sexual contact without that person's consent. (Department Exhibit No. 1). The alleged victim of these offenses, being born June 3, 1995, was, therefore, fourteen (14) years old and a minor when these crimes were allegedly committed.

It is also undisputed the criminal acts alleged against Respondent constitute sexual touching. The Criminal Complaint asserts Respondent kissed the minor child on the lips, touched the child's breast and buttocks and had the child touch Respondent's breasts and buttocks. (Department Exhibit No. 1).

The Agreement provides a rebuttable presumption of probable cause where "a tenured pedagogue has been charged with criminal conduct based on act(s) of sexual misconduct". (Joint Exhibit No. 1). Its definition of "sexual misconduct" includes, inter alia, sexual touching involving a student or minor who is not a student. The definition also includes "actions that would

constitute criminal conduct under Article 130 of the Penal Law against a student or minor who is not a student". (Id.).

I find the criminal charges pending against Respondent allege actions on her part meeting the foregoing definitions of sexual misconduct.  They allege Respondent committed acts of sexual touching involving a minor, namely, touching of breasts and buttocks.  The charges also allege acts that would constitute criminal conduct under Article 130 of the Penal Law against a minor, namely, commission of Sexual Abuse in the Third Degree in violation of Article 130.55.  These elements constitute sexual misconduct as defined in the Agreement.

Since Respondent is charged with criminal conduct based upon acts of sexual misconduct within the meaning of the Agreement, the rebuttable presumption of probable cause is established.  The presumption was not rebutted during the hearing on March 18, 2010.  Therefore, I conclude probable cause exists to remove Respondent from payroll under the terms of the parties' Agreement.

I reject Respondent's contention substantiation by SCI was required in this case in order to establish probable cause. Article 21(G)(6) of the Agreement (Joint Exhibit No. 1) states in pertinent part:

> **A rebuttable presumption of probable cause shall exist where the Special Commissioner**

11

> of Investigations ("SCI") substantiates
> allegations of sexual misconduct, or a
> tenured pedagogue has been charged with
> criminal conduct based on act(s) of sexual
> misconduct. (Emphasis supplied)

This clause provides two (2) ways for the rebuttable presumption to come into existence.  The first is where SCI substantiates allegations of sexual misconduct.  The second is where the tenured pedagogue is shown to have been charged with criminal conduct based upon act(s) of sexual misconduct.  Significantly, these two (2) ways for the presumption to come into existence are phrased in the alternative.  I conclude by doing so, the parties intended the presumption exist when either event is demonstrated.  Therefore, since the Department has shown Respondent is charged with criminal conduct based upon act(s) of sexual misconduct, the rebuttable presumption exists, without any need for substantiation of the alleged acts by SCI.

I also reject Respondent's contention evidence of investigation by the Department or testimony from an investigator or witnesses are required to establish probable cause in this case. I recognize Article 21(G)(5) (Joint Exhibit No. 1) contemplates testimony from the investigator assigned to a matter will be presented before the Probable Cause Arbitrator and statements from the alleged victim and witnesses may be presented.  However, I do not find the parties intended such

evidence be required, in a case where the presumption of probable cause, codified in Article 21(G)(6), is established by criminal charges based upon acts of sexual misconduct. After all, the whole purpose of a presumption is to establish a fact or condition without the need for proof.

Once a presumption is established, the presumed fact or condition exists. Here, the parties created a rebuttable presumption of probable cause. By doing so, they intended probable cause be deemed to exist once the presumption is established and not rebutted.

In this case, the presumption of probable cause was established by the Department's showing Respondent is charged with criminal offenses based upon acts of sexual misconduct against a minor. Since the presumption was not rebutted, probable cause is deemed to exist, without need of further evidence.

Thus, for all of the foregoing, I find probable cause exists to remove Respondent from payroll under the terms of the parties' Agreement.

**AWARD**

1.    For all of the above reasons,
the Department did have
probable cause to remove
Respondent, Lisa Guttilla,
from payroll in accordance
with the Serious Misconduct
language set forth in the
parties' Collective
Bargaining Agreement and
Memorandum of Agreement dated
October 3, 2005.

May 28, 2010.

_____
Martin F. Scheinman, Esq.
Probable Cause Arbitrator

STATE OF NEW YORK          )
                          ) ss.:
COUNTY OF NASSAU           )

I, MARTIN F. SCHEINMAN, ESQ., do hereby affirm upon my oath

as Arbitrator that I am the individual described herein and who

executed this instrument, which is my Award.

May 28, 2010.

_____
Martin F. Scheinman, Esq.
Probable Cause Arbitrator

NYCDOE-LisaGuttilla.pch

14

Exhibit 3

3-18-10 In the matter of Ms. Guttilla

SHEET 1

THE STATE EDUCATION DEPARTMENT
THE UNIVERSITY OF THE STATE OF NEW YORK

In the Matter of
NEW YORK CITY DEPARTMENT OF EDUCATION
v.
LISA GUTTILLA
Section 3020-a Education Law Proceeding (File #TBA)

DATE:              March 18, 2010

TIME:              10:30 a.m. to 10:55 p.m.

LOCATION:          NYC Department of Education
                   Office of Legal Services
                   49-51 Chambers Street
                   New York, NY 10007

BEFORE:            MARTIN SCHEINMAN, ESQ.
                   HEARING OFFICER

3-18-10 In the matter of Ms. Guttilla

**6**

1    LISA GUTTILLA - 03/18/10
2  exist where a tenured pedagog has been charged with
3  criminal conduct based on acts of sexual misconduct."
4  I have a copy of the criminal complaint.
5      THE HEARING OFFICER:  All right, so first
6  we'll make the contract Exhibit 1, unless there's an
7  objection.
8      MR. FRIEDMAN:  No, no objection.
9      THE HEARING OFFICER:  And then we'll make as
10  Department 1 the criminal complaint, may I see it
11  please?
12      MS. SHENKMAN:  Yes.  The criminal complaint
13  with the corroborating affidavit and the defense has a
14  copy.
15      MR. FRIEDMAN:  I do, yes, thank you.
16      THE HEARING OFFICER:  One second.  So these
17  are under PL-130 which is referred to in the language
18  of the contract, is that correct?
19      MS. SHENKMAN:  That's correct.
20      THE HEARING OFFICER:  So you're also citing
21  the part where it talks about criminal conduct under
22  Article 130 of the Penal Law against a student or
23  minor who is not a student?
24      MS. SHENKMAN:  Yes.
25      THE HEARING OFFICER:  All right.  I will

**7**

1    LISA GUTTILLA - 03/18/10
2  mark this then as Department Exhibit 1 will be the
3  criminal court complaint and Department Exhibit 2 will
4  be the supporting deposition.
5      [Whereupon Department of Education's Exhibit
6  1 and Exhibit 2 are admitted into evidence]
7      THE HEARING OFFICER:  Any objection?
8      MR. FRIEDMAN:  No.
9      THE HEARING OFFICER:  All right.  Do you
10  have anything else you want to put in?
11      MS. SHENKMAN:  No, that's it.
12      THE HEARING OFFICER:  So your argument is?
13      MS. SHENKMAN:  Our argument is that clearly
14  based on the criminal complaint, the Respondent has
15  been arrested for sexual misconduct, Penal Law 130,
16  different subsections of sexual abuse, clearly
17  underlying sexual misconduct.  Also, criminal conduct
18  that involves a student or a minor who is not a
19  student and, therefore, there is probable cause to
20  have the Respondent off the payroll.
21      THE HEARING OFFICER:  Do you assert how old
22  the alleged victim was?
23      MS. SHENKMAN:  Yes, the victim is 14-years-
24  old and her date of birth is in the last sentence in
25  the criminal complaint.  It's June 3rd, '95.

**8**

1    LISA GUTTILLA - 03/18/10
2      THE HEARING OFFICER:  Okay, that's what I
3  was looking for.  All right.
4      MS. SHENKMAN:  Yes, she's 14.
5      THE HEARING OFFICER:  Fourteen?  All right.
6  Mr. Friedman?
7      MR. FRIEDMAN:  Yes, Mr. Hearing Officer, I
8  direct your attention to Article 21 and G-5, serious
9  misconduct portion of the contract where it says, "to
10  establish probable cause, the investigator assigned to
11  the matter must be present and testify under oath
12  before the arbitrator.  The Board may also be required
13  to produce signed statements from the victim or
14  witnesses."  That's number one.
15      We have nothing here.  We have simply a bare
16  statement, an instrument, a criminal instrument.  We
17  have no one here from the Department, no one who
18  investigated on behalf of the Department.  We have no
19  contacts, no proof of any contact between the
20  Department and the criminal investigator.  We do not
21  have the victim.  We do not have the assistant
22  district attorney who took the information.  We have
23  nothing.  We have an indictment.  That's number one.
24      Number two going to subsection 6 "The
25  rebuttable presumption of probable cause exists where

**9**

1    LISA GUTTILLA - 03/18/10
2  the Special Commissioner of Investigation
3  substantiates allegations of misconduct."  We don't
4  have that.  We don't have a report.
5      THE HEARING OFFICER:  It says "or" has been
6  charged with criminal conduct.
7      MR. FRIEDMAN:  Okay, but we just--or has
8  been charged with--okay, then the pedagogue has been
9  charged with criminal misconduct.
10      THE HEARING OFFICER:  There is a rebuttable
11  presumption here.  You don't dispute that do you?
12      MR. FRIEDMAN:  No.  No, no, no, that's
13  correct.  But all I'm saying is that we don't have
14  anything.  We have nothing from the Department.  The
15  Department is the employer.  We have no one here
16  saying that they checked anything or did anything or
17  spoke to anybody, interviewed any of the witnesses.
18      THE HEARING OFFICER:  Okay.  Care to
19  respond?
20      MS. SHENKMAN:  Sure.  Section 5 doesn't
21  apply to what we're arguing today because this is
22  specifically a sexual offense involving students or
23  minors, therefore, Section 6 applies.  And is defined
24  clearly in Section 6, the Department is not required
25  to have any witnesses for a finding of probable cause.

Exhibit 4

6-18-12    In the Matter of Ms. Guthila

THE STATE EDUCATION DEPARTMENT
THE UNIVERSITY OF THE STATE OF NEW YORK

In the Matter of
NEW YORK CITY DEPARTMENT OF EDUCATION
v.
LISA GUTHILA
Section 3020-a Education Law Proceeding (File #TBA)


DATE:               June 18, 2012

TIME:               9:00 a.m. to 9:45 a.m.
LOCATION:           NYC Department of Education
                    Office of Legal Services
                    49-51 Chambers Street
                    New York, NY 10007


BEFORE:             MARTIN SCHEINMAN, ESQ.
                    HEARING OFFICER

6-18-12   In the Matter of Ms. Guthila

SHEET 3

6

1    LISA GUTHILA - 6/18/12
2    interviews, yes.
3        THE ARBITRATOR: So make that whole package
4    Department Exhibit 2. Who is the investigator?
5        [Whereupon Department of Education's Exhibit
6    2 is admitted into evidence]
7        MS. SHENKMAN: It is Anderson, Jeff
8    Anderson, Jeffrey Anderson.
9        THE ARBITRATOR: Okay. All right. You have
10   an opening statement?
11       MS. SHENKMAN: Yes. We are here today,
12   asking you to take the Respondent off the payroll
13   subject to a finding of probable cause. The theory
14   that we are proceeding under today is under Article
15   21-G Subsection 6. This is sexual offenses involving
16   students or minors. The student victim in this case
17   was a minor. She was 14 years old at the time. Under
18   this provision, there is a rebuttable presumption of
19   probable cause when SCS substantiates allegations of
20   sexual misconduct.
21       THE ARBITRATOR: What are you claiming under
22   that provision? Which part of the language are you...
23   This is sexual touching?
24       MS. SHENKMAN: Yes. This is sexual
25   touching, as well as soliciting a sexual relationship.

7

1    LISA GUTHILA - 6/18/12
2    And SCS substantiated the same in the report that you
3    have in evidence. And so after hearing the evidence
4    and hearing the testimony of the investigator who did
5    the investigation, we will be asking you to find
6    probable cause.
7        THE ARBITRATOR: Thank you. Mr. Friedman.
8        MR. FRIEDMAN: Yes. Mr. Hearing Officer...
9        THE ARBITRATOR: Mr. Arbitrator in this
10   case.
11       MR. FRIEDMAN: Oh, Mr. Arbitrator?
12       THE ARBITRATOR: I'm the arbitrator which is
13   different than the hearing [phonetic].
14       MR. FRIEDMAN: Okay. Three things. Number
15   one, this is the second time, as you noted before,
16   Respondent was taken off payroll, already subsequently
17   restored, but she was off payroll for approximately a
18   year and a half. That's number one. Number two, all
19   of the criminal charges relating to this alleged event
20   have been dismissed and sealed. I have copies of
21   those for you, too. Number three is the SCI report
22   and the SCI substantiation is based not on single
23   hearsay, but on triple hearsay. We have an SCI
24   report. The SCI is investigating the mother of
25   Student A, who is the alleged victim. And the SCI

8

1    LISA GUTHILA - 6/18/12
2    investigator said according to what was told to the
3    mother by the daughter and then subsequently was told
4    by the mother to the investigator. That's triple
5    hearsay. And then we have, as noted in the SCI
6    report, we have absolutely no one with knowledge, with
7    firsthand knowledge of the facts. We don't have a
8    witness. We don't have Student A. We have nothing.
9    We have the mother and the testimony will come out, if
10   I'm given permission to allow the Respondent to
11   testify in this proceeding that she appeared in the
12   criminal court 18 times and no one appeared on behalf
13   of either the victim. The mother never appeared.
14       THE ARBITRATOR: Are you going to be able to
15   produce somebody in your case?
16       MS. SHENKMAN: Yes. The victim, as far as I
17   know, will be coming in for the 3020-a hearing.
18       THE ARBITRATOR: You understand there's a
19   rebuttal of presumption, so you can try to rebut the
20   presumption if you want. But that's why I would ask
21   that question. I would ask the investigator that. So
22   you're representing it is your understanding that the
23   victim is going to come in, if there was a victim.
24       MS. SHENKMAN: That's what the victim's
25   mother said to the investigator the last time they

9

1    LISA GUTHILA - 6/18/12
2    spoke, that she would be bringing her daughter to the
3    3020-a hearing.
4        MR. FRIEDMAN: Well, but what you have here
5    establishes probable cause.
6        THE ARBITRATOR: Well, the contract says if
7    your finding establishes probable cause. That's what
8    it says.
9        MR. FRIEDMAN: But if the finding is based
10   on triple hearsay?
11       THE ARBITRATOR: Well, I mean, that's
12   frankly for the merits. And I can understand, if it
13   triple hearsay, how you'll make that argument to the
14   hearing officer. It's not me. I don't know--who is
15   it? Who is the hearing officer that's been assigned?
16       MR. FRIEDMAN: Eleanor Glanstein.
17       MS. SHENKMAN: Yeah.
18       THE ARBITRATOR: Ms. Glanstein will take
19   that into account. I suspect that will be significant
20   to her. But that's not my purview.
21       MR. FRIEDMAN: Well, may I make an argument?
22       THE ARBITRATOR: You can.
23       MR. FRIEDMAN: It acknowledges... I mean,
24   how can you have probable cause when there's no one
25   with any type of firsthand knowledge of the

6-18-12   In the Matter of Ms. Guthila

SHEET 5

14

ANDERSON - DIRECT - SHENKMAN
1
2  breasts and buttocks over their clothing on several
3  occasions in the bathroom at Poly Prep.  And the
4  mother then contacted Ms. Guthila the same day.  This
5  was January 20th of 2010.  According to the mother,
6  the mother had a conversation with Ms. Guthila, where
7  she says that she will withdraw money from the bank.
8       THE ARBITRATOR:  This is what the mother's
9  telling you?
10      A.  This is what the mother's telling me.
11      THE ARBITRATOR:  Do you believe her?
12      A.  Yes.
13      THE ARBITRATOR:  All right.  Why did you
14  believe the mother?
15      A.  As she was telling me the story, I
16  found her to be credible throughout the story,
17  throughout her statement.  At this point, there was no
18  reason not to believe her.  There was also the...
19  This would be on the 20th...
20      THE ARBITRATOR:  Of January.
21      A.  ...of January.  And she doesn't report
22  to the police on the 20th.  She reports it the
23  following day, on the 21st.
24      THE ARBITRATOR:  How many times did you see
25  the mother?

15

ANDERSON - DIRECT - SHENKMAN
1
2      A.  Let's see.  I met her twice and I'd
3  spoken with her on the phone just numerous times.
4      THE ARBITRATOR:  Well, you know they said
5  apparently they didn't cooperate in the prosecution.
6  Right?
7      A.  That's correct.
8      THE ARBITRATOR:  The mother, nor the child.
9      A.  Correct.
10      THE ARBITRATOR:  And you think the mother is
11  going to cooperate when the trial is...  Well, tell me
12  first, let's start with the mother.  What did she say
13  about cooperating in this process?
14      A.  She's very cooperative.  She was very
15  cooperative with me.  She's always returned my calls.
16  She hasn't missed any appointments.
17      THE ARBITRATOR:  Did she explain why she
18  didn't participate in the criminal case, and she's
19  participating now?
20      A.  What initially happened, what Mother A
21  tells me is that her and Student A's father are living
22  apart.  And after she went to the police that put a
23  strain on the relationship between the mother and the
24  daughter, and that the daughter actually moved out to
25  live with the father.  Subsequently now, several

16

ANDERSON - DIRECT - SHENKMAN
1
2  months later, when they go to the district attorney's
3  office, the daughter's out of the household, living
4  with the father, the mother is trying to repair her
5  relationship with her daughter, and when the daughter
6  went to the district attorney's office and didn't want
7  to cooperate, I think the mother felt that whatever
8  needs to be done to repair the relationship between
9  her and her daughter, that's what she was going to do.
10      THE ARBITRATOR:  And you never spoke to the
11  daughter?
12      A.  No.
13      THE ARBITRATOR:  All right.  And so what you
14  have from the mother is allegedly this admission about
15  the money.  Right?  That's what she knows personally.
16  And you have from the mother only what the daughter
17  told the mother.  Did the mother see the alleged
18  hickey?
19      A.  Yes.
20      THE ARBITRATOR:  What did she say about
21  that?
22      A.  That the hickey was from kissing with
23  Ms. Guthila.
24      THE ARBITRATOR:  That's what she was told.
25  What did she say about what she saw?

17

ANDERSON - DIRECT - SHENKMAN
1
2      A.  It appeared to her to be a hickey.
3      THE ARBITRATOR:  She told you that?
4      A.  Yes.
5      THE ARBITRATOR:  So she told you it was a
6  hickey, and it appeared to be a hickey.  And she told
7  you that Ms. Guthila had said that she was going to
8  give her money if she didn't report it.
9      A.  That's right.
10      THE ARBITRATOR:  All right.  What did the
11  mother say about the kid testifying, the daughter?
12      A.  Again...  To come here?  That she will
13  make her available.  The daughter will testify.
14      THE ARBITRATOR:  But she wouldn't make her
15  available to you?
16      A.  She didn't, no.
17      THE ARBITRATOR:  Doesn't that make you
18  skeptical about whether she's going to be available
19  here?
20      A.  No, because I think now, and, again,
21  I've had several phone conversations with the mother.
22  The relationship between the mother and the daughter,
23  according to the mother, has become stronger again.
24  And I've had conversations with her...
25      THE ARBITRATOR:  "Her" meaning the mother?

6-18-12   In the Matter of Ms. Guthila

SHEET 7

22

1    ANDERSON - DIRECT - FRIEDMAN
2    BY MR. STEVEN FRIEDMAN
3        MR. FRIEDMAN: The question is, When he
4    spoke to the detective during the criminal case, did
5    the detective inform him how many times Ms. Guthila
6    had appeared in court?
7        THE ARBITRATOR: I'll accept your
8    representation. It was 18 times?
9        A. 18 times.
10       THE ARBITRATOR: Actually, he wouldn't know
11   that, but if you tell me it was, I'll assume that as
12   an officer of the court, you're reflecting what you
13   know.
14       A. Yes.
15       MR. FRIEDMAN: And could you please ask the
16   investigator, too, if he knows the span of time
17   between the preferral of the charges and the charges
18   were dismissed?
19       A. No, I don't.
20       THE ARBITRATOR: But you said it started, it
21   was reported in January. Right?
22       A. It was reported in January.
23       THE ARBITRATOR: Do you know when it was
24   dismissed?
25       A. I believe it was July.

23

1    ANDERSON - DIRECT - FRIEDMAN
2        THE ARBITRATOR: Is that right?
3        MR. FRIEDMAN: Let me make sure I have
4    the... Well, I'd actually like to put this in - -.
5        THE ARBITRATOR: You can just tell me when
6    it was.
7        MR. FRIEDMAN: Okay. We have a full
8    dismissal as July.
9        THE ARBITRATOR: All right. So let's
10   stipulate then in the record.
11       MR. FRIEDMAN: Okay. 2011.
12       THE ARBITRATOR: I'm saying sometime
13   between--I don't think there's any dispute about this.
14   In January of 2009, the Respondent was...
15       MS. SHENKMAN: It was 2010.
16       THE ARBITRATOR: '10. In '10, Respondent
17   was arrested and it was dismissed and sealed in July
18   of 2011.
19       MR. FRIEDMAN: Okay. Could you also do me a
20   favor and ask him if the investigator had inquired as
21   to why over the span of a year and a half that the
22   mother nor the daughter came to testify in the
23   proceeding?
24       A. I don't know.
25       THE ARBITRATOR: They're adults. They

24

1    ANDERSON - DIRECT - FRIEDMAN
2    didn't cooperate. That's all... He's not going to
3    know other than he did tell us. He told us what the
4    mother said. But, frankly, it's not probative of
5    anything for this proceeding. I understand why this
6    would be relevant to Ms. Glanstein, but we can
7    continue.
8        MR. FRIEDMAN: And I know he testified that
9    he never spoke to Student A, but did he ever have an
10   opportunity to observe her?
11       THE ARBITRATOR: Did you ever see her?
12       A. No.
13       MR. FRIEDMAN: Okay. Is it true then that
14   you never had an opportunity to determine whether
15   Student A was - - because you never saw her?
16       A. I never saw her, no.
17       MR. FRIEDMAN: I have nothing further.
18   Thank you.
19       THE ARBITRATOR: Thank you very much. All
20   right. Do you rest? Ms. Shenkman, do you rest?
21       MS. SHENKMAN: Yes.
22       THE ARBITRATOR: All right. What do you
23   want to do?
24       MR. FRIEDMAN: I just want to ask the
25   Respondent a few questions.

25

1    LISA GUTHILA - 6/18/12
2        THE ARBITRATOR: All right. But here's the
3    problem with that. This process does not allow cross-
4    examination. I'll allow her to talk because she's
5    allowed to, but you're opening it up to me asking
6    questions that might be different than what they've
7    asked. So are you certain about this?
8        MR. FRIEDMAN: No. No, you're right.
9        THE ARBITRATOR: Because I have to ask the
10   question which might not be, in an evidentiary manner,
11   fair to Respondent. I mean, I understand the problem
12   with this proceeding, and I understand the points, and
13   I saw Ms. Shenkman's got to deal with the warts
14   [phonetic], but I'm here on the probable cause. I'm
15   not here on anything else. Obviously, if the mother
16   nor the student show up, I don't know what Ms.
17   Shenkman will do in her case. But that's not what I
18   have.
19       MR. FRIEDMAN: Okay. Fair enough. But may
20   I just ask them to put in the...
21       THE ARBITRATOR: Sure. Make that...
22       MR. FRIEDMAN: Do you want the original or
23   a...
24       THE ARBITRATOR: No, that's fine.
25       MR. FRIEDMAN: Do you want a copy of it?

6-18-12    In the Matter of Ms. Guthila

SHEET 9

30

32

LISA GUTHILA - 6/18/12

Student Index

None

1  LISA GUTHILA - 6/18/12
2  which show, at the very least, some sort of
3  inappropriate relationship occurring,  With 9,000 text
4  messages in a one-month period, it's clear that the
5  relationship was personal between them.
6      THE ARBITRATOR:  But you're not on person
7  here, you're on sexual touching.
8      MR. FRIEDMAN:  Sexual touching.
9      MS. SHENKMAN:  That's correct, but I--
10     THE ARBITRATOR:  [Interposing] Or
11  soliciting.  Two arguments.
12     MS. SHENKMAN:  I believe that the phone
13  records are corroborating evidence of soliciting
14  sexual - - .
15     THE ARBITRATOR:  I'll let you know.  As is
16  our practice, I'll issue an award some time by the end
17  of the week with a full opinion to follow once I
18  receive the transcript.  And I think, you know, I'm
19  not certain, I'm going to think about it, which I
20  always do, but assuming that this is so, I would want
21  this to be scheduled as soon as possible for Ms.
22  Glanstein to look at these issues fully vetted in the
23  process which permits these kind of questions to be
24  resolved.  Thank you all.  Good luck to you.
25     (The hearing adjourned at 9:45 a.m.)

31

C E R T I F I C A T E
I, Melissa Strickland, do hereby certify that the
foregoing typewritten transcript of proceedings in the
matter of New York City Department of Education v. Lisa
Guthila, File No. TBA was prepared using the required
transcription equipment and is a true and accurate record
of the proceedings.
Signature: _____
Date: _____    June 26, 2012    _____

6-18-12   In the Matter of Ms. Guthila

## 1

**1** [5] 4:24 5:3,7 26:8,10
**10** [2] 23:16,16
**14** [1] 6:17
**18** [3] 8:12 22:8,9
**188** [1] 20:7
**1st** [2] 20:7,15

## 2

**2** [2] 6:4,6
**2009** [4] 12:23 20:7,7 23:14
**2010** [2] 23:16,15
**2011** [2] 23:11,18
**20th** [4] 14:5,19,22 20:15
**21-g** [2] 6:15 28:18
**21st** [1] 14:23
**22nd** [1] 20:7
**24** [1] 29:12
**26** [2] 3:1,1

## 3

**3020-a** [2] 8:17 9:3
**305** [1] 20:17

## 4

**4** [4] 3:1,1,1,1

## 6

**6** [3] 3:2,2 6:15
**6/18/12** [13] 4:1 5:1 6:1 7:1 8:1 9:1
  10:1 25:1 26:1 27:1 28:1 29:1 30:
  1

## 9

**9,000** [2] 20:20 30:3
**9,399** [1] 20:18
**9:00** [1] 4:2
**9:45** [1] 30:25
**9th** [1] 2:52

## A

**a's** [7] 13:13,20 15:21 20:3,4,6,16
**a.m** [2] 4:2 30:25
**able** [2] 8:14 28:12
**above** [1] 21:12
**absolutely** [1] 8:6
**accept** [1] 22:7
**according** [6] 8:2 14:5 17:23 19:
  19 29:7
**account** [1] 9:19
**acknowledged** [1] 27:11
**acknowledges** [1] 9:23
**across** [1] 12:24
**acting** [2] 12:16,22
**actually** [5] 15:24 22:10 23:4
**ada** [1] 19:12
**addition** [3] 18:10,24 29:24
**adjourned** [1] 30:25
**admission** [3] 16:14 27:7 28:23
**admitted** [5] 4:24 5:7 6:6 18:12 26:
  11
**adults** [1] 23:25
**affected** [1] 19:10
**affirm** [1] 10:14
**afterwards** [1] 26:6

## B

**background** [2] 11:17,21
**bank** [1] 14:7
**bargaining** [2] 3:1 4:16
**based** [5] 7:22 9:9 26:19 27:12,12
**bathroom** [1] 14:3
**become** [1] 17:23
**begin** [1] 5:13
**behalf** [1] 8:12
**believe** [7] 12:3 14:11,14,18 22:25
  28:16 30:12

**agreement** [2] 3:1 4:16
**allegations** [3] 6:19 10:2 19:17
**alleged** [5] 7:19,25 16:17 19:7 26:
  21
**allegedly** [2] 16:14 29:18
**allow** [3] 8:10 25:3,4
**allowed** [1] 25:5
**allows** [1] 27:21
**already** [1] 17:16
**ambiguity** [1] 27:22
**analogy** [1] 10:2
**anderson** [25] 6:7,8,8 10:13,16,18,
  22 11:1,4 12:1 13:1 14:1 15:1 16:
  1 17:1 18:1 19:1 20:1,1 21:1,20 22:
  1 23:1 24:1 27:10 29:13
**another** [4] 5:16 12:20 13:6 20:14
**answer** [1] 21:23
**apart** [1] 15:22
**apologized** [1] 18:14
**apparently** [1] 15:5
**appeared** [6] 8:11,12,13 17:2,6 22:
  6
**applies** [1] 28:10
**appointments** [1] 15:16
**approximately** [1] 7:17
**arbitrator** [89] 4:3,7,11,20 5:2,12,
  17,19,23 6:3,9,21 7:7,9,9,11,12,12
  8:14,18 9:6,11,18,22 10:9,12,17,
  20,23 12:5,8,12 13:16 14:8,11,13,
  20,24 15:4,8,10,17 16:10,13,20,24
  17:3,5,10,14,17,25 18:5 21:9,16,
  19,23 22:7,10,20,23 23:2,5,9,12,
  16,25 24:11,19,22 25:2,9,21,24 26:
  8,13,15 27:5,14,20 28:7,14 29:5,
  11,16,22 30:6,10,15
**argue** [1] 28:25
**argument** [4] 9:13,21 26:16 28:15
**arguments** [1] 30:11
**arrest** [2] 19:2,11
**arrested** [1] 23:17
**article** [2] 6:14 28:18
**articulate** [1] 18:16
**assigned** [2] 9:15 11:12
**assistant** [1] 10:18
**assume** [1] 22:11
**assuming** [1] 30:20
**attempt** [1] 4:16
**attends** [1] 12:15
**attention** [1] 11:11
**attorney's** [3] 16:2,6 19:16
**available** [4] 17:13,15,18 18:3
**award** [1] 30:16

**besides** [1] 19:24
**between** [8] 15:23 16:8 17:22 20:
  8,16 22:17 23:13 30:5
**bit** [1] 27:4
**both** [1] 12:20
**bottom** [1] 27:2
**breasts** [3] 14:2 19:9 21:12
**bringing** [1] 9:2
**broadway** [1] 2:52
**brought** [2] 4:4,15
**building** [1] 12:20
**buttocks** [3] 14:2 19:9 21:12

## C

**call** [2] 10:10 13:13
**calls** [5] 15:15 20:8,11,18,20
**came** [2] 12:24 23:22
**car** [1] 10:6
**case** [14] 4:4,12,17 6:16 7:10 8:15
  11:10,25 15:18 19:13 22:4 25:17
  28:8,8
**cause** [17] 4:3 6:13,19 7:6 9:5,7,24
  10:4,5,8 25:14 26:19 27:4 28:6,8,
  17,21
**cell** [3] 13:21,21 20:16
**certain** [2] 25:7 30:19
**characterization** [2] 27:13,17
**charge** [1] 12:17
**charges** [3] 7:19 22:17,17
**check** [1] 27:22
**child** [1] 15:8
**city** [1] 11:8
**claiming** [1] 16:21
**clear** [1] 30:4
**closing** [1] 26:18
**clothes** [2] 19:9 21:13
**clothing** [1] 14:2
**coaching** [1] 12:18
**collective** [2] 3:1 4:15
**come** [8] 9:2,23 11:11 17:12 20:24
**comfortable** [1] 5:21
**coming** [1] 8:17
**commenced** [1] 4:2
**commission** [1] 10:19
**commissioner's** [2] 3:2 5:15
**completely** [1] 27:18
**concerned** [1] 29:5
**conclusion** [1] 20:25
**conduct** [2] 11:19 29:8
**connection** [1] 11:25
**contact** [1] 20:16
**contacted** [1] 14:4
**contacts** [1] 20:22
**context** [1] 27:18
**continue** [1] 24:7
**continues** [1] 14:17
**contract** [2] 4:21 9:6
**conversation** [3] 14:6 18:14,20
**conversations** [2] 17:21,24
**cooperate** [4] 15:5,11 16:7 24:2
**cooperating** [1] 15:13
**cooperative** [2] 15:14,15
**copies** [1] 17:7
**copy** [5] 4:21 5:9,24 25:25 26:3

**correct** [5] 10:22 15:7,9 29:19 30:
  9
**corroborating** [3] 19:23 29:25 30:
  13
**couple** [2] 13:11 18:6
**court** [3] 8:12 22:6,12
**covering** [1] 13:10
**credible** [2] 14:16 19:10
**criminal** [5] 7:19 8:12 15:18 19:13
  22:4
**cross** [1] 25:3
**cross-examination** [1] 27:24
**crosstalk** [1] 29:21
**culpability** [1] 27:11

## D

**da's** [1] 19:14
**daughter** [9] 8:3 9:2 12:14,22,25
  13:3,19 15:24,24 16:5,5,9,11,16
  17:11,13,22 18:3,21 23:22 29:20
**daughter's** [1] 16:3
**day** [5] 14:4,23 20:10 29:12,17
**daytime** [1] 20:21
**deal** [1] 25:13
**december** [2] 20:7,15
**decision** [1] 4:14
**demaury** [1] 12:10
**department** [6] 4:4,10 5:3,6 6:4,5
**department's** [1] 4:16
**described** [1] 13:14
**detective** [6] 18:25 19:19 22:4,5
  26:23,25
**determine** [1] 24:14
**difference** [1] 28:7
**different** [2] 7:13 25:6
**direct** [16] 11:1,2 12:1 13:1 14:1
  15:1 16:1 17:1 18:1 19:1 20:1 21:
  1,25 22:1 23:1 24:1
**dismissal** [1] 23:8
**dismissed** [4] 7:20 22:18,24 23:
  17
**disposition** [2] 3:1 26:9
**dispute** [1] 23:13
**district** [3] 16:2,6 19:15
**doe** [2] 11:13 12:19
**done** [1] 16:8
**driving** [3] 10:3,4,7
**duress** [2] 29:3,21
**during** [3] 20:21 22:4 27:24

## E

**each** [3] 13:25,25 19:8
**education** [1] 4:10
**education's** [2] 5:6 6:5
**either** [1] 8:13
**eleanor** [1] 9:16
**employed** [1] 11:22
**employee** [1] 12:19
**end** [1] 30:16
**enough** [1] 25:19
**erratically** [2] 10:4,7
**essentially** [1] 26:17
**establishes** [2] 9:5,7
**even** [1] 27:3

6-18-12    In the Matter of Ms. Guthila

**over** [3] 14:2 19:9 23:21

## P

**package** [1] 6:3
**panel** [1] 28:11
**part** [1] 16:22
**participate** [1] 15:18
**participating** [1] 15:19
**partner** [1] 10:6
**past** [1] 12:19
**payroll** [4] 4:17 6:12 7:16,17
**perception** [1] 27:23
**period** [2] 28:9 30:4
**permission** [1] 8:10
**permit** [1] 27:24
**permits** [1] 30:23
**person** [5] 11:18 12:2,5,7 30:6
**personal** [1] 30:5
**personally** [1] 16:15
**pertinent** [1] 19:4
**phone** [17] 13:21,21 15:3 17:21 18:
  13 20:3,4,6,12,14,16,17,17,20,23
  29:25 30:12
**phonetic** [6] 7:13 11:13,13 12:11
  19:10 25:14
**please** [4] 5:21 10:12,13 22:15
**plenty** [1] 28:17
**point** [2] 14:17 27:25
**pointed** [1] 28:23
**points** [1] 25:12
**police** [4] 10:2,6 14:22 15:22
**poly** [3] 12:15,23 14:3
**possible** [2] 26:22 30:21
**practice** [1] 30:16
**preferral** [1] 22:17
**prep** [3] 12:15,23 14:3
**prepared** [1] 12:25
**presumption** [5] 6:18 8:19,20 28:
  18,20
**previous** [1] 4:12
**private** [1] 12:15
**probable** [17] 4:3 6:13,19 7:6 9:5,
  7,24 10:4,5,8 25:14 26:18 27:4 28:
  6,8,17,20
**probative** [1] 24:4
**problem** [2] 25:3,11
**proceeding** [5] 6:14 8:11 23:23
  24:5 25:12
**process** [6] 4:13 15:13 25:3 27:21,
  25 30:23
**procured** [1] 29:25
**produce** [1] 8:15
**prosecution** [1] 15:5
**provision** [2] 6:18,22
**public** [1] 11:8
**pursuant** [1] 4:15
**purview** [1] 9:20
**put** [4] 5:14 15:22 23:4 25:20

## Q

**quadruple** [1] 26:22
**questing** [1] 27:14
**question** [4] 8:21 21:21 22:3 25:
  10

**questioned** [1] 13:3
**questions** [7] 13:19 18:7 21:17 24:
  25 25:6 27:10 30:23
**quickly** [1] 28:13

## R

**raise** [1] 10:13
**really** [1] 28:5
**reason** [1] 14:18
**reasons** [2] 19:13,15
**rebut** [1] 8:19
**rebuttable** [2] 6:18 28:18
**rebuttal** [1] 8:19
**recant** [1] 19:20
**receive** [1] 30:18
**receives** [1] 15:12
**record** [2] 10:12 23:10
**records** [6] 20:4,4,6,13,15,23 29:
  25 30:13
**reflecting** [1] 22:12
**regina** [1] 11:14
**relating** [1] 7:19
**relationship** [14] 6:25 13:23 15:23
  16:5,8 17:22 18:12,17,20 19:8 21:
  5 29:10 30:3,5
**relevant** [1] 24:6
**remind** [1] 28:3
**remove** [1] 14:17
**removed** [1] 27:2
**repair** [2] 16:4,8
**repeat** [1] 21:20
**report** [10] 3:2 5:15 7:2,21,24 8:6
  14:21 17:8 21:7 26:25
**reported** [6] 10:7 22:21,22 29:2,8,
  11,15,17
**reports** [2] 10:7 14:22
**representation** [1] 22:8
**representing** [2] 4:5 8:22
**requested** [1] 11:13
**requests** [1] 13:20
**resolve** [1] 29:23
**resolved** [1] 30:24
**respondent** [10] 6:12 7:16 8:10
  23:14,16 24:25 25:11 26:8 27:11
  28:23
**respondent's** [1] 26:10
**response** [1] 18:21
**responses** [1] 13:20
**rest** [2] 24:20,20
**restored** [1] 7:17
**returned** [1] 15:15
**reveals** [1] 13:22
**review** [1] 13:5
**reviewing** [2] 20:5,23
**road** [1] 10:3

## S

**same** [2] 7:2 14:4
**satisfied** [1] 13:20
**saw** [6] 10:6 16:25 24:15,16 25:13
  26:20
**saying** [3] 23:12 27:7,15
**says** [4] 9:6,8 14:7 28:19
**scheduled** [1] 30:21

**school** [3] 11:23 12:15,20
**schools** [1] 11:8
**sci** [8] 7:21,22,23,24,25 8:5 10:21
  28:19
**scintilla** [1] 27:3
**scs** [2] 6:19 7:2
**sealed** [2] 7:20 23:17
**search** [1] 10:5
**second** [2] 7:15 20:12
**see** [5] 14:24 15:2 16:17 24:11 28:
  6
**sees** [1] 10:3
**sensitive** [1] 27:9
**sent** [1] 13:2
**set** [2] 20:12,14
**several** [3] 14:2 15:25 17:21
**sexual** [12] 6:15,20,23,24,25 21:5
  28:19 29:2,8 30:7,8,14
**she's** [8] 13:19,23 15:14,15,18 17:
  18 18:2 25:4
**shenkman** [44] 4:9,9 5:8,11,14,18,
  20,25 6:7,11,24 8:16,24 9:17 10:
  10,11,15 11:1,3 12:1 13:1 14:1 15:
  1 16:1 17:1 18:1,6 19:1 20:1 21:1
  23:15 24:20,21 25:17 26:2,6 28:
  12,16 29:7,14,19,24 30:9,12
**shenkman's** [1] 25:13
**show** [2] 25:16 30:2
**showed** [1] 20:16
**significant** [1] 19:19
**single** [1] 7:22
**skeptical** [1] 17:18
**soliciting** [3] 6:25 30:11,13
**somebody** [1] 8:15
**someone** [3] 10:3,8 13:4
**sometime** [1] 23:12
**soon** [1] 30:21
**sorry** [1] 18:22
**sort** [1] 30:2
**span** [2] 22:16 23:21
**speaking** [1] 18:24
**special** [3] 3:2 5:15 10:19
**specifications** [3] 3:1 5:3,10
**spoke** [9] 9:2 12:4 16:10 19:12 22:
  4 24:9 26:20
**spoken** [1] 15:3
**start** [1] 15:12
**started** [1] 22:20
**statement** [2] 6:10 14:17
**steps** [2] 11:15 27:2
**steven** [3] 4:6,6 22:2
**still** [4] 13:6 28:11 29:9,9
**stipulate** [1] 23:10
**stop** [1] 10:5
**story** [3] 14:15,16 19:20
**strain** [1] 15:23
**stronger** [1] 17:23
**student** [28] 6:16 7:25 8:8 13:2,7,9,
  10,13,14,20,22,22 15:21 18:18 19:
  6,7,16 20:3,4,6,8,16 21:5 24:9,15
  25:16 26:24 29:2
**students** [1] 6:16
**stupid** [2] 18:15,22
**subject** [1] 6:13

**subpoenaed** [1] 20:3
**subscriber** [1] 20:5
**subsection** [1] 16:15
**subsequently** [4] 7:16 8:3 13:6
  15:25
**substantiate** [1] 21:6
**substantiated** [1] 7:22
**substantiates** [2] 6:19 28:19
**substantiation** [1] 7:22
**sufficient** [1] 28:17
**supervising** [2] 10:18,20
**supporting** [1] 13:11
**suspect** [1] 9:19

## T

**teacher** [2] 11:8,22
**team** [2] 12:17,23
**telephone** [2] 12:6 20:18
**tells** [4] 13:12,18,22 15:21
**terry** [1] 11:12
**testified** [3] 24:8 27:10 29:13
**testify** [8] 8:11 10:24 17:13 19:18
  23:22
**testifying** [1] 17:11
**testimony** [7] 14:7 4:8 9 27:6 28:22
**text** [3] 20:18,20 30:3
**that'd** [1] 26:3
**theory** [1] 6:13
**there's** [9] 4:22 8:18 9:24 20:14
  23:13 26:18 27:20 28:18,22
**they've** [1] 25:6
**though** [1] 27:12
**three** [2] 7:14,21
**throughout** [3] 14:16,17 28:21
**timing** [2] 20:19 29:6
**tiniest** [1] 27:3
**tiny** [1] 27:3
**title** [1] 10:17
**today** [3] 4:14 6:11,14
**together** [1] 12:20
**took** [2] 11:16 27:18
**touched** [2] 13:25 19:8
**touching** [4] 6:23,25 30:7,8
**transcript** [1] 30:18
**trial** [1] 15:11
**tried** [1] 28:13
**triple** [4] 7:23 8:4 9:10,13
**true** [2] 19:21 24:13
**trust** [1] 12:21
**truth** [3] 10:14,14,15
**try** [1] 8:19
**trying** [1] 16:4
**twice** [1] 15:2
**two** [3] 7:18 28:9 30:11
**type** [1] 9:25

## U

**uncooperative** [1] 19:17
**under** [6] 6:14,14,17,21 29:3,20
**understand** [4] 4:18 8:18 9:12 24:
  5 25:11,12 27:8,25
**understanding** [1] 8:22
**unless** [4] 4:21 5:15 21:23
**up** [2] 25:5,16

EXHIBIT 5

State of New York, State Education Department
Hearing Officer:  Eleanor Glanstein, Esq.
_____ X

**In the Matter of the Disciplinary Proceeding of the
NEW YORK CITY DEPARTMENT OF EDUCATION**

                                        **Complainant,**

        -against-

                                                        **POST-CHARGE
                                                        STIPULATION OF
                                                        SETTLEMENT**

**Lisa Guttilla,**
                                                        SED# 19438

                                        **Respondent.**

_Pursuant to Education Law  §3020-a._
_____ X


        **WHEREAS,** the Department of Education of the City School District of the City of

New York, (hereinafter  "Department") has preferred disciplinary charges against **Lisa**

**Guttilla** (hereinafter "Respondent"), file number 729002, a tenured teacher employed by

the Department, pursuant to Education Law Section 3020-a; and

        **WHEREAS,** the parties desire to eliminate the need for a formal hearing, have

held discussions where they were represented by counsel, have had all the terms and

conditions of this Stipulation of Settlement (hereinafter "Stipulation") thoroughly

explained and now freely consent to enter into this Stipulation, such consent not having

been induced by fraud, duress, or any other influence; and

        **WHEREAS,** no other person not a party to this proceeding has an interest in its

outcome, and no party to this proceeding is an infant or incompetent person for whom a

committee has been appointed; and

        **WHEREAS,** the parties have reached an agreement as to the complete and final

resolution of this matter;

**NOW IT IS HEREBY AGREED AND STIPULATED** by and between said parties that this matter shall be fully resolved as follows:

1.  Subject to the terms and conditions enumerated in this Stipulation of Settlement, the Department agrees to discontinue the aforementioned Education Law §3020-a hearing.

2.  Respondent irrevocably resigns from her employment with the Department effective June 29, 2012. Annexed hereto as Exhibit "A" is a copy of her resignation.

3.  Respondent agrees that such resignation shall be irrevocable. Respondent understands and agrees that she shall not seek or accept future employment with the New York City Department of Education. Respondent understands that this irrevocable resignation may or may not affect her ability to work for a vendor doing business with the Department. The Department represents that any case where the Department has denied a vendor the ability to employ a person by virtue of the individual's irrevocable resignation, a review of the matter will be done by Human Resources. Although the Department has the final decision concerning employment, the Department will not unreasonably deny a vendor from hiring former Department employees who have irrevocably resigned.

4.  The parties to this Stipulation of Settlement knowingly waive their right to make any legal or equitable claims or to initiate legal or administrative proceedings of any kind against each other or against their respective employees, relating to or arising out of these proceedings, except to enforce this Stipulation of Settlement. Respondent further agrees to withdraw any charges, grievances, claims or actions relating to or arising out of this matter that may have been commenced in any forum whatsoever, with the exception of UFT grievance case number K47506, a copy of which is attached as Exhibit B.

5.  A copy of this stipulation shall be maintained in the Office of Legal Services and Respondent's personnel file.

6.  Respondent agrees that she has entered into this agreement freely, knowingly and openly, without coercion or duress and that she has voluntarily waived all statutory, contractual or constitutional rights that she

may have held in this matter for a hearing in accordance with Education Law §3020-a.

7.  Respondent affirms that she has had access to counsel in reaching this agreement and has consulted with counsel regarding the terms of this stipulation of settlement and has entered into this agreement with advice and consent.

8.  Nothing in this stipulation shall be deemed to be a practice or policy of the Department of Education.

9.  This written agreement contains all the terms and conditions agreed upon by the parties hereto and no other agreement, oral or otherwise, regarding said allegations and charges shall be deemed to exist or to bind any of the parties hereto or to vary any of the terms contained therein.

_____          _____6/29/2012_____
Lisa Guttilla,                                                    DATE
Respondent

_____          _____6/29/12_____
RICHARD E. CASAGRANDE, NYSUT                     DATE
Attorney for Respondent
52 Broadway, 9th Floor
New York, New York 10004
BY: Steven Friedman, Esq., of Counsel

_____          _____6/29/12_____
THERESA EUROPE                                          DATE
Attorney for Complainant
NYC Department of Education
49-51 Chambers Street
New York, N.Y. 10007
BY: Nancy Ryan, Esq., of Counsel

_____          _____
Joseph Gogliormella                                      DATE
Principal
James Madison High School
Brooklyn, NY

3

Exhibit B

## STEP 2 GRIEVANCE REQUEST FORM

UFT Case # **K47506**
File Date: October 14, 2011
*Lisa Guttilla*
250 Amsterdam ave
Staten Island, NY 10314
Contact Phone # 718-837-8958
File # 729002
School: Madison H.S.
District: 73

Attention:  David Brodsky

Dear Chancellor Walcott:

Pursuant to the procedures set forth in **Article 22** of the Collective Bargaining Agreement covering **Teachers**, the Union requests a conference with you or your designated representative to discuss the following complaint, which was not resolved at the first step.

*Provide Background of complaint(s):*
I was suspended without pay as a result of a probable cause hearing.  My case was dismissed and sealed on 7/28/11. I submitted this certificate of disposition to OPI. I have not been restored to payroll.

*Articles of the Contract Violated:*
20, 21g

*Provide remedy being sought:*
To be restored to payroll immediately and to be made whole in all ways including back pay with interest for the entire period of suspension without pay.

The employee shall be represented at the conference by a representative designated by the Union.

Sincerely,

*Howard Schoor*
Howard Schoor
Borough Representative

cc: Ellen Gallin-Procida
     Charley Turner - District Representative

HS:tn
OPEIU:153